[No. D004129. Fourth Dist., Div. One. May 28, 1987.]

EDISON W. MILLER, Plaintiff and Appellant, v.
BRUCE NESTANDE et al., Defendants and Respondents.

COUNSEL

Richard V. McMillan and Dorie A. Rogers for Plaintiff and Appellant.

Parker, Stanbury, McGee, Babcock & Combs, George H. Babcock, Robert A. Walker, Selvin & Weiner, Paul P. Selvin and James S. Tyre for Defendants and Respondents.

OPINION

**WORK, J.**—Former prisoner of war, Edison W. Miller, colonel, United States Marine Corps, retired, appeals a summary judgment entered in favor of Bruce Nestande and several former prisoners of the North Vietnamese on Miller's causes of action for defamation, intentional infliction of emotional distress and negligence. This litigation arose from Nestande's mailing defamatory pamphlets to more than 100,000 registered voters within the Third Supervisorial District of Orange County during his successful campaign to unseat Miller in the 1980 election for county supervisor. The political flyer, authorized by Nestande and signed by more than 200 former prisoners of the North Vietnamese, essentially alleged Miller had cooperated with the enemy after his capture to the detriment of his fellow American prisoners.

Although Miller posits his contentions somewhat differently, the principal issue on appeal is whether the trial court was correct in applying the holdings of *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254[11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412] and *Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244 [208 Cal.Rptr. 137, 690 P.2d 610], when it determined the record fails to clearly and convincingly show there is a triable issue of

fact as to whether Nestande or the former prisoners made the publication with actual malice, i.e., knowing the communicated material was false or entertaining serious doubts that it was true. *(New York Times Co. v. Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706]; *St. Amant* v. *Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 267, 88 S.Ct. 1323].) We conclude Miller's status as an incumbent candidate for public office requires application of the narrow definition of actual malice expressed in federal decisions even though the defendants do not claim media status. Further, an examination of the record reveals no triable issue of fact as to Miller's inability to prove the defendants acted with actual malice. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Miller, a highly decorated United States Marine Corps fighter pilot, was shot down on October 13, 1967, while leading a mission over North Vietnam. He was captured and held prisoner by the North Vietnamese for five and one-half years. During this time, he and fellow prisoners suffered extreme abuse from their captors. Unlike most of his fellow prisoners, after several years of captivity he voluntarily made antiwar communications at the behest of the North Vietnamese.

After his release, Miller was charged with violating the Uniform Code of Military Justice, and issued an administrative letter of censure by the Secretary of the Navy stating his conduct while a prisoner did not meet the high standard required of military officers and was severely detrimental to the welfare and the morale of his fellow prisoners.[1]

On July 9, 1979, Miller was appointed to the Orange County Board of Supervisors. Miller's appointment created a media furor in light of his activities while a prisoner. Both before and after his appointment, Miller was the subject of numerous news articles recounting his conduct while imprisoned. Many articles contained statements from fellow prisoners, most of whom scathingly denounced Miller's lack of patriotism. An in-depth history of the commissioned officers held captive in North Vietnam was published in 1976.[2] This detailed treatise along with many published articles, was submitted as an exhibit in support of the motions for summary judgment and contrasts Miller's conduct with that of the many prisoners who suffered severe torture without succumbing to these pressures by voluntarily broadcasting or otherwise aiding their captors.

---

[1] In 1985, Miller obtained a federal "order" removing the letter of censure from his military file because he had not been given a hearing and an opportunity to be heard. *(Miller* v. *Lehman* (D.D.C. Jan. 28, 1985) Dock. No. 84-2417.)

[2] Hubbell, POW (Reader's Digest Press (1976)).

The June 1980 election race between Miller and Nestande for the supervisorial seat was hotly contested. Approximately one week before the election, Nestande mailed the offending political flyer to more than 100,000 registered voters. The pamphlet stated:

"Dear Fellow American:

"(1) Each and every one of us is a former American Prisoner of War. We were held for periods ranging from a few months to over 8 years in Communist North Vietnamese prisons.

"(2) Each and every one of us was aware that Edison W. Miller was also held with us as a Prisoner of War in Communist North Vietnam.

"(3) Each and every one of us urges you to vote against Edison W. Miller in his campaign for County Supervisor, or any other public office Edison W. Miller might seek.

"(4) Do you know that Edison W. Miller cooperated with the enemy to the detriment of his fellow American Prisoners of War?

"(5) Do you know that Edison W. Miller wrote articles for the Communist North Vietnamese that were against the interests of his government and against the interests of his fellow POW's?

"(6) Do you know that Edison W. Miller willingly made a tape recording that was broadcast over Radio Hanoi that supported the Communist North Vietnamese?

"(7) We, who were there, know. We also know that in doing these things, Edison W. Miller violated his oath as a Military Officer, and disobeyed the lawful orders of his superiors.

"(8) It is clear to each of us that Edison W. Miller does not have the dedication to duty, to his country, or to a sense of service which would qualify him for *any* public office.

"(9) We are not politically active as a group. We now live all across this great nation. However, on the issue of Edison W. Miller, we all have one thing in common: We cannot believe any patriotic group of Americans would select a person like Edison W. Miller for any position of public trust.

"(10) Please, in the interest of integrity in public office, we urge you to reject Edison W. Miller."

Nestande and the ex-prisoner of war (POW) filed their respective motions for summary judgment in March 1985, alleging there existed no triable issue of fact because Miller could not prove by clear and convincing evidence they had acted with malice. In granting the motions, the trial court stated: ". . . I have no evidence that shows to the court that Mr. Miller has clear and convincing evidence of actual malice such that this case should go to the jury."

We stress the only ground raised in the motion for summary judgment was that there was no triable issue of fact as to whether Nestande or the POW's had acted with actual malice. Although each raised an affirmative defense of truth by answer there was no attempt to establish the truth of the allegedly defamatory material at summary judgment. Instead, the evidence submitted in support of the motions consisted solely of self-serving declarations to the effect that each defendant had a good faith belief those allegations were true, accompanied by a compilation of published materials purporting to describe Miller's objectionable conduct while imprisoned.

The defendants do not contend the distributed statements are not defamatory or that they were not intentionally disseminated in an effort to prevent Miller from retaining public office. Further, there is no dispute but that the allegations were represented as statements of fact, not expressions of opinion. Therefore, for the purpose of the appeal, we assume there has been publication of false information which is libelous per se.[3]

I

The latest judicial dune in the shifting decisional sands underlying the law of defamation regarding public figures was sculptured by *Anderson* v. *Liberty Lobby, Inc.* (1986) 477 U.S. 242 [91 L.Ed. 2d 202, 106 S.Ct. 2505] when the United States Supreme Court held that summary judgment is appropriate upon a properly supported motion unless a public-figure plaintiff affirmatively establishes by clear and convincing evidence a genuine issue of fact exists as to whether actual malice can be established at trial. (*Id.* at p. 257 [91 L.Ed.2d at p. 217].) Relying on language in *Rebozo* v. *Washington Post Co.* (5th Cir. 1981) 637 F.2d 375, 381, the California Supreme Court had earlier adopted the same standard in *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at page 252. Thus, the trial court correctly evaluated the evidence to determine whether Miller could produce clear and convincing evidence of actual malice at trial.

---

[3]Because the pamphlet directly accuses Miller of cooperating with an enemy of the United States during a period of hostilities in violation of his oath as an officer on active duty, it disseminates material which is defamatory on its face. (Civ. Code, §§ 45, 45a.)

■ Although the parties seeking summary judgment bear the initial burden to support their motions with admissible evidence showing there is no triable issue of material fact, once that showing has been made the opposing party can only avoid summary adjudication by submitting competent rebuttal evidence from which the court can infer these material facts are genuinely disputed. (Code Civ. Proc., § 437c; *Brejcha* v. *Wilson Machinery, Inc.* (1984) 160 Cal.App.3d 630, 640 [206 Cal.Rptr. 688].) In support of their contention there was no factual issue as to their lack of any serious doubt as to the truthfulness of their statements, Nestande and the other defendants submitted numerous newspaper articles and the historical treatise, POW. Most articles were published in Orange County and neighboring Los Angeles County, criticizing Miller's conduct while a prisoner, decrying his lack of patriotism and accusing him of openly aiding the enemy to the detriment of his fellow prisoners. These allegations were attributed to Miller's fellow captives, some of whom signed the offending pamphlet. Miller produced no affirmative evidence of actual malice in opposition to summary judgment. Whatever opposing proof there is must be gleaned from among the vitriol engrossed on the defendants' flyers and self-serving declarations.

## II

■■■■, ■ Miller argues *Anderson*'s heavy burden to avoid summary judgment in defamation cases is not shifted to a plaintiff except where it is necessary to protect the *news media* when it criticizes conduct of public *officials* in their *official capacity*. However, the plaintiffs to whom that burden was affixed in *Anderson* and *Reader's Digest* were not public officials, but only "public figures."[4] (*Anderson* v. *Liberty Lobby, Inc., supra,* 477 U.S. at p. 244 [91 L.Ed.2d at p. 209]; *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 256.) In each of those cases, the court required the plaintiffs to establish they had the ability at trial to clearly and convincingly prove the statements were published with knowledge they were false or with reckless disregard of whether they were false or not. This is the classic standard from *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pages 279-280 [11 L.Ed.2d at p. 706], where the Supreme Court "fundamentally altered judicial treatment of defamation actions by placing [this] significant constitutional limitation on the ability of a public official to recover damages for a defamatory falsehood." *(Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 252.) It applies not only to "public figures" (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 335-336, 342-343 [41 L.Ed.2d 789, 803, 807]; *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 154-155 [18

---

[4]In this context, public figures are individuals who have achieved such public notoriety or fame as to have achieved special prominence in the resolution of public questions. (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 351 [41 L.Ed.2d 789, 811-812, 94 S.Ct. 2997].)

L.Ed.2d 1094, 1111, 87 S.Ct. 1975]; *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 253), but also to private figures defamed with statements which are of public concern *(Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 775 [89 L.Ed.2d 783, 792, 106 S.Ct. 1558]).

### III

■ Even so, Miller claims neither the *Anderson* evidentiary burden nor the *New York Times* actual malice test protects *nonmedia* defendants like Nestande and the pamphleteering ex-prisoners. Although the United States Supreme Court has yet to directly address whether a public or private figure libeled by allegations relating to matters of public concern must prove those statements to be false or reckless when made by nonmedia defamers *(Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at p. 779, fn. 4 [89 L.Ed.2d at p. 794]; *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.* (1985) 472 U.S. 749, 753-754 [86 L.Ed.2d 593, 598-599, 105 S.Ct. 2939, 2942]), at least two Justices (Brennan and Blackmun) *(Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pp. 779-780 [89 L.Ed.2d at p. 795] (conc. opn. of Brennan, J.)) and maybe more *(Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc., supra,* 472 U.S. at p. 781 [86 L.Ed.2d at p. 617, 105 S.Ct. at pp. 2957-2959] (dis. opn. of Brennan, J.)); Comment, *Dun & Bradstreet* v. *Greenmoss: Cutting Away the Protective Mantle of Gertz* (1986) 37 Hastings L.J. 1171, 1192) would make no distinction. Such rationale is based on the perception that First Amendment publications are rooted in the inherent worth of informing the public, not on the identity of the source. *(Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. at pp. 779-780 [89 L.Ed.2d at p. 795] (conc. opn. of Brennan, J.)); *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc., supra,* 472 U.S. at p. 781 [86 L.Ed.2d at p. 617, 105 S.Ct. at p. 2957] (dis. opn. of Brennan, J.).)[5]

---

[5] Justice Brennan further explained: "Such a distinction is irreconcilable with the fundamental First Amendment principle that '[t]he inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.' [Citation.]

"First Amendment difficulties lurk in the definitional questions such an approach would generate. And the distinction would likely be born an anachronism. Perhaps most importantly, the argument that *Gertz* should be limited to the media misapprehends our cases. We protect the press to ensure the vitality of First Amendment guarantees. This solicitude implies no endorsement of the principle that speakers other than the press deserve lesser First Amendment protection. 'In the realm of protected speech, the legislature is constitutionally disqualified from dictating ... the speakers who may address a public issue.' [Citations.]

"The free speech guarantee gives each citizen an equal right to self-expression and to participation in self-government. [Citations.] This guarantee also protects the rights of listeners to 'the widest possible dissemination of information from diverse and antagonistic sources.' [Citation.] Accordingly, at least six Members of this Court (the four who join this opinion and Justice WHITE and THE CHIEF JUSTICE) agree today that, in the context of defamation law, the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities. [Citation.]" *(Id.* at pp. 782-784 [86 L.Ed.2d at pp. 617-619, 105 S.Ct. at pp. 2957-2959], fns. omitted.)

In *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc., supra,* 472 U.S. at page 759 [86 L.Ed.2d at page 602, 105 S.Ct. at pages 2945-2946], the Supreme Court emphasized the special protection adhering to communications concerning public affairs which it characterized as occupying the highest rung of the hierarchy of First Amendment values. Although such a distinction has been criticized for impliedly providing too little protection for speech involving only private matters (see Comment, *Dun & Bradstreet* v. *Greenmoss: Cutting Away the Protective Mantle of Gertz, supra,* 37 Hastings L.J. at p. 1172), the emphasis on the public concern content of the defamatory communication is central to our resolution of this case. In an era of an increased awareness of the need for personal integrity in those to whom the public entrusts its governance, knowledge of the personal qualifications of candidates for public office is the lifeblood of an informed electorate. Such communication is indeed "more than self-expression. . . ." (*Garrison* v. *Louisiana* (1964) 379 U.S. 64, 75 [13 L.Ed.2d 125, 133, 85 S.Ct. 209].)

Here, Miller first pointedly interjected his military record and his North Vietnamese imprisonment into his campaign in a mailer portraying a Marine Corps insignia and a POW bracelet with his rank, name and date of capture. This fund solicitation begins:

"Dear Fellow Americans:

"For 5-1/2 years I was a POW in North Vietnam.

"I know you remember me because you were one of the people who wore a POW bracelet with my name on it or wrote to me and my family. . . .

". . . . . . . . . . . . . . . . . . . . . .

". . . Now that I have left the military, I want to continue serving my country in government. I want to bring to elected office the same strong feelings you and I shared in the past: patriotism, honesty, decency, and concern for our fellow man."

Miller's flyer heavily emphasizes his status as, and impliedly his conduct while, a prisoner. Whatever privacy expectations he might have had regarding his activities during that time became irrelevant when he directly injected this factor into his campaign.[6] Nestande's rebuttal mailer describing

---

[6]His military record otherwise had been highly publicized and was outstanding. His rapid rise to Marine Lieutenant Colonel and squadron leader was based in part on his capacity for hard work and his exhibited bravery. When shot down after leading 70 missions over Vietnam, he suffered 2 cracked vertebrae and a broken ankle. During a six-week forced march on the broken ankle he lost eighty pounds and was severely beaten.

Miller's conduct in captivity as distinctly unpatriotic and detrimental to the welfare of his fellow prisoners, is "that type of speech indispensable to decision making in a democracy." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 777 [ 55 L.Ed.2d 707, 718, 98 S.Ct. 1407].) Whether criticism of public officials is published by the media or disseminated by individuals, we hold it is protected by the constitutional standard expressed in *New York Times.*[7]

## IV

 Miller argues the *New York Times* standard applies only to statements criticizing his conduct in the performance of his official duties. He cites the passage "[t]he constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his *official conduct* unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 279-280 [11 L.Ed.2d at p. 706], italics added.) Miller cites no cases which expressly restrict the scope to "official conduct." The very application of the actual malice protection to public figures, who do not hold public office, shows the fallacy in Miller's narrow interpretation. (See *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at pp. 335-336, 342-343 [41 L.Ed.2d at pp. 803, 807]; *Curtis Publishing Co.* v. *Butts, supra,* 388 U.S. at pp. 154-155 [18 L.Ed.2d at p. 1111]; *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 253; *Widener* v. *Pacific Gas & Electric Co.* (1977) 75 Cal.App.3d 415, 432 [142 Cal.Rptr. 304], disapproved on other grounds in *McCoy* v. *Hearst Corp.* (1986) 42 Cal.3d 835, 847, fn. 9 [231 Cal.Rptr. 518, 727 P.2d 711].) Further, numerous decisions have applied the *New York Times* standard to published allegations defaming public figures in regards other than their conduct in public office. For instance, in *Noonan* v. *Rousselot* (1966) 239 Cal.App.2d 447 [48 Cal.Rptr. 817], the defamed plaintiff was a nonincumbent candidate for public office "smeared" when an opposing Republican primary candidate alleged he was the lackey of left-wing Democrats. This political character assassination attempt was deemed subject to the *New York Times* test. (*Id.* at p. 451.) Further, the alleged libels in *Anderson* v. *Liberty Lobby, Inc., supra,* 472 U.S. 242 [91 L.Ed.2d 202], were an investigative reporter's depiction of a self-described "citizens lobby" and its founder as neo-nazi, antisemitic, racist and fascist. These epithetic characterizations were held to require summary judgment review according to the *New York Times* standard.

---

[7]To the extent that language in this court's earlier decision, *Schomer* v. *Smidt* (1980) 113 Cal.App.3d 828, 834 [170 Cal.Rptr. 662], may be construed as suggesting the constitutional standard does not apply to nonmedia defendants (see Comment, *Actual Malice* (1986) 16 Sw.U.L.Rev. 577, 604-606), it is disapproved.

More so than the facts addressed in *Noonan* and *Liberty Lobby,* the exposition of Miller's POW activities as perceived by fellow prisoners relates to facets of Miller's behavior which he himself stressed as showing his fitness to be retained in public office. Expressions of opinion on these matters to the voters in Miller's supervisorial district is manifestly speech subject to the constitutional protection addressed by *New York Times.* It is this seemingly self-evident proposition which led the United States Supreme Court to reformulate the "official conduct" rule to encompass a candidate's private life insofar as it reflects on fitness for public office. (*Monitor Patriot Co.* v. *Roy* (1971) 401 U.S. 265, 274-275 [28 L.Ed.2d 35, 42, 91 S.Ct. 621].) In *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at page 281 [11 L.Ed.2d at page 707], the court quoted approvingly from *Coleman* v. *MacLennan* (1908) 78 Kan. 711 [98 P. 281, 286], as follows: "[I]t is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great. . . . "

Although both the *Coleman* and *New York Times* cases involved alleged libels pertaining to in-office conduct of public officials, the reference to the need to protect a free flow of information regarding qualifications of persons applying for, as well as already holding, public office compels the application of an actual malice standard to candidates for office.

V

The trial court correctly found no triable issue of fact as to actual malice. Whatever inferences could otherwise have been drawn from the pamphlet itself, in light of the defendants' declarations supported by the numerous newspaper articles, transcripts of media broadcasts and compilation of statements from Miller's fellow prisoners in Hubbell's treatise, POW, there is no evidence suggesting any defendant believed the allegations were false. Nor is there any evident possibility that Miller can show any defendant entertained a serious doubt that the consistent, numerous published descriptions of Miller's conduct and his censure by the Secretary of the Navy accurately characterized his role in activities detrimental to the welfare of his fellow prisoners and to this country's military position. Nestande personally verified the accuracy of these widely disseminated reports from more than 200 persons who were held prisoner at the same time as Miller, who were privy to first-hand reports and/or claimed to be personally aware of the facts related. These ex-prisoners are the remaining defendants who rely, in large part, on contemporaneous reports transmitted through a complex clandes-

tine prisoner communication network and their personal observations. (See generally Hubbell, POW.)

Miller attacks the judgment as based on Nestande's reliance on "hearsay and rumor" which does not satisfy the requirements of admissible evidence under Evidence Code section 1201. However, Nestande's diligence in attempting to corroborate the accuracy of published reports of Miller's conduct by personally contacting the fellow prisoners of war more than meets the investigative burden to show good faith. For instance, in *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at page 259, the court considered a similar argument, finding a failure to conduct an objective investigation relatively inconsequential where one relies on sources considered to be reliable. The defendants in *Reader's Digest* considered their sources to be of "unsullied" reputation. (*Ibid.*) Here, Nestande relied on reports from persons whose bias is evident, but whose integrity and reliability is not otherwise questioned. These sources relied on their own observations and the general information known to each other by virtue of their common experiences as prisoners of war.

In sum, we hold this case is subject to the *New York Times* test of actual malice and there is no triable issue of fact regarding whether any defendant communicated these allegations knowing them to be untrue or having a serious doubt of their truth. Finally, because Miller's additional causes of action for intentional infliction of emotional distress and negligence are predicated upon the same facts as the defamation action, they also fail to survive the motion for summary judgment. (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 265.)

Judgment affirmed.

Kremer, P. J., and Butler, J., concurred.