[No. A035323. First Dist., Div. Two. June 23, 1988.]

HOFMANN COMPANY, Plaintiff and Appellant, v.
E. I. DU PONT DE NEMOURS AND COMPANY et al.,
Defendants and Respondents.

## COUNSEL

James E. Cox, Dan L. Garrett, Jr., and Beatrice Taines for Plaintiff and Appellant.

Pillsbury, Madison & Sutro, Walter R. Allan, Clement L. Glynn and Brian L. Cella for Defendants and Respondents.

## OPINION

KLINE, P. J.—In statements that appeared in a front-page story in the San Francisco Chronicle and elsewhere, employees of a toxic chemical plant criticized a housing development proposed to be constructed next to the plant. The questions before us are whether the employees' comments included false statements of fact actionable as trade libel and, if not, whether, consistent with the First Amendment, the statements may nonetheless provide the basis for a cause of action for intentional interference with prospective economic advantage.

### STATEMENT OF THE CASE

Appellant, the Hofmann Company, filed a complaint alleging that certain employees of respondent E. I. Du Pont de Nemours and Co. made false statements about the housing development appellant proposed to build near Du Pont's chemical plant in Contra Costa County. As pertinent to this appeal, the complaint stated causes of action for trade libel and intentional interference with prospective economic advantage.[1] The trial court initially granted respondent's demurrer without leave to amend because in "the context in which the alleged defamatory expressions were made, . . . they were expressions of opinion, unambiguous as such, and therefore protected speech."

---

[1] Additional causes of action for negligent interference with prospective economic advantage, public nuisance and declaratory relief were stated. By failing to present any arguments about these causes of action to this court, appellant has waived any objections to the trial court's sustaining of the demurrer as to them. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 479, pp. 469-470; *Henderson v. Security Nat. Bank* (1977) 72 Cal.App.3d 764, 769 [140 Cal.Rptr. 388].)

After appellant's attorney filed a declaration stating he had obtained evidence showing that at the time respondents made their statements they did not honestly believe the views they expressed and voiced them for the sole purpose of obstructing the housing development, the court allowed appellant to amend the complaint to include a cause of action for intentional interference with prospective economic advantage.[2] The amendment added the allegation that if the statements at issue were found to be opinions, "defendants did not in fact hold a good faith, honest belief in the truth thereof." Respondents again demurred. The trial court sustained the demurrer without leave to amend and dismissed the action. This appeal followed.

## STATEMENT OF FACTS[3]

Appellant is a Contra Costa County developer which owns and intends to develop property in Antioch adjacent to and downwind of respondent Du Pont's chemical plant. In its manufacturing operations, the plant uses toxic chemicals that are delivered by trains switched off the main line into the plant yard. One edge of the proposed development lies along the rail spur leading to the plant. Appellant's development plans have been approved by the Contra Costa County Board of Supervisors.

Du Pont offered to purchase the property in question, but appellant demanded too high a price. After the negotiations broke off, Du Pont's plant manager at the time, David Gilbert, published through unidentified "news media" the statement that the proposed housing development "was in a place which was unsafe and hazardous for human life and health, and that he 'would not live there.'"

The other statements at issue appeared in the October 23, 1984, edition of the San Francisco Chronicle. A front-page article, entitled "Developers and Contributions: The Contra Costa 'Syndrome,'" discussed the approval of appellant's subdivision plans and the general pattern of development approval in Contra Costa County. Emphasizing the political contributions made by housing developers to most county supervisors, the article noted

---

[2] The amendment purported to state two causes of action, one for intentional diminution of property value and another for intentional interference with prospective economic advantage. We treat the first as a variant of the second rather than as a separate tort.

[3] Because of the procedural posture of this case, we treat as true the facts alleged in appellant's complaints; we also consider the facts judicially noticed by the trial court. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) The trial court took judicial notice of the San Francisco Chronicle article in which respondent McNamara's statements appeared. Also noticed were the draft environmental impact report prepared when appellant sought permission to develop, as well as letters to the Contra Costa County Planning Department from the Bay Area Air Quality Management District and the California Air Resources Board. (Evid. Code, §§ 452, 459.)

that the only supervisor who voted against appellant's project received no such contributions.

After discussing the large quantities of toxic chemicals shipped to the plant on the railroad spur that passed by the development project, the article pointed out that the Bay Area Air Quality Management District and the California Air Resources Board both opposed appellant's plans. According to the article, "[These] agencies wrote the county at least six times, and among other things, noted: Toxic releases from DuPont forced three evacuations since 1964, at least 18 releases were recorded since 1977, and the wind blows to the east—toward the proposed homes—70 percent of the time."

Dennis McNamara, who succeeded David Gilbert as plant manager, was quoted: "'I wouldn't live there . . . . We run around the clock, we have rail traffic and truck traffic all the time and we handle hazardous chemicals. It's like building homes off the end of a runway. You hope nothing happens, but occasionally it does.'"

The article concluded with a description of the physical effects of a recent leak of toxic sulfur dioxide gas at the plant that required evacuation of a nearby area and the hospitalization of 20 people. Another quote from McNamara ended the article: "We've never had what we call a life-threatening incident and we don't expect any—but the potential does exist.'"

When Gilbert and McNamara made the statements just related they allegedly were acting as agents and employees of defendant Du Pont, and within the course and scope of their said agency and employment. The purpose of the statements, according to the complaint, was to prevent completion of the housing development and to thereby depress and diminish the value of plaintiff's land so as to further defendant's plan to acquire said land for a price deemed acceptable to defendant Du Pont.

## DISCUSSION

■ Preliminarily, we note that we must "treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." (*Serrano* v. *Priest, supra,* 5 Cal.3d 584, 591.) Where a demurrer has been sustained without leave to amend, the issue on appeal is whether the pleadings state a cause of action and "whether there is a reasonable probability that the defect can be cured by amendment . . . ; if not, there has been no abuse of discretion . . . . [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." [Citation omitted.] (*Blank* v. *Kirwin* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

## I.

### *Cause of Action for Trade Libel*

■ Trade libel is " 'an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff' "; it is accomplished by a false statement. (*Polygram Records, Inc.* v. *Superior Court* (1985) 170 Cal.App.3d 543, 548 [216 Cal.Rptr. 252], quoting *Erlich* v. *Etner* (1964) 224 Cal.App.2d 69, 73; Rest.2d Torts, §§ 623A, 626.) ■ Because the gravamen of the complaint is the allegation that respondents made false statements of fact that injured appellant's business, the "limitations that define the First Amendment's zone of protection" are applicable. (*Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033, 1042 [232 Cal.Rptr. 542, 728 P.2d 1177], cert. den. 485 U.S. 934 [99 L.Ed.2d 268, 108 S.Ct. 1107].) "[I]t is immaterial for First Amendment purposes whether the statement in question relates to the plaintiff himself or merely to his property . . . ." (*Id.,* at p. 1043, citation omitted.)

■ If respondents' statements about appellant are opinions, the cause of action for trade libel must of course fail. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact."[4] (*Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 339-340, fn. omitted [41 L.Ed.2d 789, 805, 94 S.Ct. 2997].) Statements of fact can be true or false, but an opinion—"a view, judgment, or appraisal formed in the mind . . . [, a] belief stronger than impression and less strong than positive knowledge"—is the result of a mental process and not capable of proof in terms of truth or falsity. (Webster's Third New Internat. Dict. (1970) p. 1582.)

■ In most cases "[t]he critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law." (*Gregory* v. *McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601 [131 Cal.Rptr. 641, 552 P.2d 425]; *Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 450 [175 Cal.Rptr. 157, 629 P.2d 1369]; *Baker* v. *Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) However, where a statement is ambiguous and capable of being understood by the

---

[4] The same result can be reached logically, without recourse to the First Amendment. The Restatement Second of Torts classifies trade libel as a variety of injurious falsehood. (§§ 623A, 626, pp. 334-347; see also *Polygram Records, Inc.* v. *Superior Court, supra,* 170 Cal.App.3d at pp. 548-550.) Although the restatement's explication of this tort does not make a distinction between statements of fact and opinion, the examples it uses—e.g., "A does not sell certain goods" and "A is no longer in business"—make it clear that trade libel is ordinarily accomplished by factual assertions which, unlike opinions, can be objectively verified. (Rest.2d Torts at p. 335.)

average reader as being either fact or opinion, categorization of the statement is not a question of law and must be left to the jury's determination. (*Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672, 680-682 [150 Cal.Rptr. 258, 586 P.2d 572].)[5]

■ "The distinction [between fact and opinion] frequently is a difficult one . . . ." (*Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 601; see also, *Bose Corp.* v. *Consumers Union of United States, Inc.* (1st Cir. 1982) 692 F.2d 189, 194, affd. 466 U.S. 485 [80 L.Ed.2d 502, 104 S.Ct. 1949]; Prosser & Keeton, The Law of Torts (5th ed. 1984) § 113A, pp. 813-815; Titus, *Statement of Fact Versus Statement of Opinion—A Spurious Dispute in Fair Comment* (1962) 15 Vand.L.Rev. 1203; note, *Fair Comment* (1949) 62 Harv.L.Rev. 1207.) To make the differentiation "California courts have developed a 'totality of the circumstances' test . . . ." (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at p. 260.) The court must put itself in the place of an " ' "average reader" ' " and decide the " ' "natural and probable effect" ' " of the statement. (*Ibid.,* citing *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 547 [343 P.2d 36].) The words themselves must be examined to see if they have a defamatory meaning, or if the " ' "sense and meaning . . . fairly presumed to have been conveyed to those who read it" ' " have a defamatory meaning. (42 Cal.3d at p. 261, citing *Scott* v. *McDonnell Douglas Corp.* (1974) 37 Cal.App.3d 277, 291, fn. 11 [112 Cal.Rptr. 609].) Statements " 'cautiously phrased in terms of apparency' " are more likely to be opinions. (42 Cal.3d at pp. 260-261, citing *Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 603.)

In addition to the language, the context of a statement must be examined. (*Baker, supra,* 42 Cal.3d at p. 261.) The court must "look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." (*Ibid.*)

With those guidelines in mind, portions of respondent McNamara's comments are not difficult to characterize. The statement: " 'We run around the clock, we have rail and truck traffic all the time and we handle hazardous chemicals,' " is unquestionably factual. We also find that either this state-

---

[5] The *Good Government* approach has received considerable judicial criticism in other jurisdictions. An Eighth Circuit opinion notes that "for good reason," nearly all jurisdictions vest the trial court with the decision about whether a statement is one of fact or opinion. (*Janklow* v. *Newsweek, Inc.* (8th Cir. 1986) 788 F.2d 1300, 1305, fn. 7.) "[B]ecause such questions generally tend to be problematic and involve important First Amendment issues, they remain within the province of the trial court, which in any event would be asked to review any jury decision" based on finding a statement is factual. (*Janklow* v. *Newsweek, Inc., supra,* 788 F.2d at p. 1305, fn. 7.) Another court pointed out that leaving the fact/opinion distinction to the trial court contributes to the "predictability of decisions" and comports with the Supreme Court's mandate that "questions as to other privileges derived from the First Amendment . . . are to be decided as matters of law." (*Ollman* v. *Evans* (D.C.Cir. 1984) 750 F.2d 970, 978.)

ment is true or that it in no way disparages appellant's planned housing development. Respondents' use of hazardous chemicals is alleged in the complaint, and therefore something we must assume to be true. (*Serrano* v. *Priest, supra,* 5 Cal.3d at p. 591.)

The statement " 'We've never had what we call a life-threatening incident and we don't expect any—but the potential does exist,' " is mixed fact and opinion. McNamara's expectation about the probability of a serious accident is an opinion, but taking the sentence as a whole we find it states an indisputable truth: manufacturing processes that use hazardous chemicals have the "potential" of leading to accidents that cause serious injury or death. (Evid. Code, § 452, subd. (h).)

Appellant argues that the statement "I wouldn't live there"—might be an opinion but for the fact that both McNamara and Gilbert said the same thing. Appellant thinks the identical statements are "suspicious" and "negate[ ] any argument that [they] constitute spontaneous expression of opinion." We do not agree. The record is silent as to when and where Gilbert spoke, but we do not find it remarkable both said they would not want to live close to the chemical plant they managed.

The comment "It's like building homes off the end of a runway. You hope nothing happens, but occasionally it does" cannot be called factual. The fact that the simile is incapable of objective proof is indicative of opinion. (*Ollman* v. *Evans, supra,* 750 F.2d 970, 979; *Hotchner* v. *Castillo-Puche* (2d Cir. 1977) 551 F.2d 910, 913.) Moreover, considered in context the remark was measured; McNamara indicated that Du Pont had a good safety record and that serious accidents were unlikely. To say that something happens "occasionally" is hardly a definitive prediction of imminent disaster, as appellant suggests, and also points toward opinion rather than fact. (*Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 260-261.) This interpretation is not affected by the debatably provocative nature of McNamara's runway analogy, which is almost "rhetorical hyperbole," an imaginative expression of the perceived danger of permitting housing to be built next to a toxic chemical plant. (See *Letter Carriers* v. *Austin* (1974) 418 U.S. 264, 286 [41 L.Ed.2d 745, 763, 94 S.Ct. 2770].)

Appellant argues that two factors necessitate finding that, though McNamara's remarks might appear to represent opinion, the average reader would understand them to be factual. First, relying upon the restatement, appellant argues that the statements are based on undisclosed facts and therefore cannot be deemed opinion. Section 566 of the Restatement Second of Torts states that a cause of action for defamation exists when "an opinion in form or context [ ] is apparently based on facts regarding the plaintiff or his conduct that have not been stated or assumed to exist by the parties to

the communication." (Com. b, p. 172; see, e.g., *Baker* v. *Los Angeles Herald Examiner, supra,* 42 Cal.3d at pp. 266-267; *Okun* v. *Superior Court, supra,* 29 Cal.3d at pp. 451-452.) This theory has no application in this case because the basis of McNamara's statements are thoroughly disclosed. He noted the proximity of the housing, the large volume of hazardous chemicals used at the plant, the heavy rail and truck traffic and the 24-hour operation. Any doubt about the relevance of these facts was dispelled by the balance of the Chronicle article, which discussed, among other things, the numerous past episodes of toxic releases at the plant.

■ Appellant next argues that because Gilbert and McNamara were Du Pont plant managers, their expertise lends authority to their statements that would cause the average reader to assume they were asserting facts. Appellant relies on *Slaughter* v. *Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886], a case in which an insurance company wrote letters to policy holders denying coverage for dental claims because their dentist, the plaintiff, had performed " 'unnecessary' " work for which he " 'overcharg[ed].' " (*Id.,* at p. 153.) The insurance company also said it intended to report the dentist to the "California Dental Association" for disciplinary proceedings. (*Ibid.*) The court held that demurrers to the dentist's complaint for libel and interference with prospective economic advantage were improperly sustained. (*Id.,* at p. 155.) Relying on *Good Government Group of Seal Beach, Inc.* v. *Superior Court, supra,* 22 Cal.3d at p. 682, the court found the statements did not unambiguously constitute either fact or opinion and should therefore go to the jury. (32 Cal.3d at p. 154.) It reasoned that although the statements at issue "when made by laymen might indeed constitute mere opinion, similar accusations by professional dental plan administrators carry a ring of authenticity and reasonably might be understood as being based on fact." (*Ibid.*)

*Slaughter* is distinguishable. A dental insurance plan administrator authorizes payment of bills where treatment was necessary and the cost in line with policy coverage, matters about which such administrators presumably possess expertise. The administrator's stated intention to report the dentist to an official-sounding group reinforced this aura of authority. Respondent McNamara, on the other hand, offered an opinion relating to a land use decision, a subject about which chemical plant managers are not thought particularly knowledgeable.

This not to say McNamara's apparent knowledge and expertise regarding the management of a chemical plant and the properties of toxic chemicals plays no role in the average reader's mind or in our analysis. It does. It is a basis of our conclusion that McNamara asserted a fact regarding the potential for serious accidents, but we have found this to be true. The opinion that it was unwise to develop housing so near the Du Pont plant, and that

he would not live there, does not rest on any special scientific knowledge undisclosed to the Chronicle's readers. Rather, we find it to be an entirely reasonable opinion that many people could reach on the basis of the facts presented in the article. Neither McNamara's statements nor the article as a whole conveys a "seeming scientific nature . . . [that] would support the position that the statements are factual." (*Bose Corp.* v. *Consumers Union of United States, Inc., supra,* 692 F-2d 189, 194; see also *Hotchner* v. *Castillo-Puche, supra,* 551 F.2d at p. 913.) The fact that other points of view were included in the Chronicle article (see discussion, *post,* at p. 406) provides an additional reason McNamara's remarks would likely be understood by readers as opinions. (See *Gregory* v. *McDonnell Douglas Corp., supra,* 17 Cal.3d at p. 601.)

To conclude, we hold that the statements of respondents Gilbert and McNamara are either assertions of true facts or unambiguous opinions.

## II.

### Cause of Action for Intentional Interference With Prospective Economic Advantage

Having held that respondents' comments were either true statements of fact or unambiguous statements of opinion, we must now decide whether the First Amendment protects such speech when the speaker uses it to intentionally interfere with the prospective economic advantage of another.[6] The second amended complaint alleged not only that respondents made false statements of fact, but also alternatively claimed that even if the statements in question were deemed opinions, respondents did not honestly hold the views they expressed and voiced them solely to damage appellant's business interests and diminish the value of its property.

California courts have countenanced lawsuits for intentional interference with prospective economic advantage accomplished "either by unlawful means or by means otherwise lawful when there is a lack of sufficient justification." (*Herron* v. *State Farm Mutual Ins. Co.* (1961) 56 Cal.2d 202, 205 [14 Cal.Rptr. 294, 363 P.2d 310].)[7] The focus of inquiry in such business

---

[6]Paragraph 18 of the complaint stated: "in the event said statements should be considered to be cast in the form of opinion . . . [respondents] did not in fact hold a good faith, honest belief in the truth thereof. Further, [respondents] either deliberately cast their statements in an equivocal form in the hope of insinuating a disparaging import to the average reader, or they acted with a reckless disregard of whether their words would be interpreted by the average reader as disparging statements of fact."

[7]*Herron* v. *State Farm Mutual Ins. Co., supra,* 56 Cal.2d 202 discusses interference with contract, but that tort "is merely a species of the broader tort of interference with prospective economic advantage. [Citations.]" (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 823 [122 Cal.Rptr. 745, 537 P.2d 865].)

torts is not so much the means, but "the defendant's culpable intent and the damages resulting from the interference . . . ." (*Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 18 [144 Cal.Rptr. 664, 6 A.L.R.4th 184]; see also 2 Harper and James, The Law of Torts (2d ed. 1986) §§ 6.5- 6.6, pp. 300-308 and Rest. 2d Torts (1979), introductory note to ch. 37 and §§ 766-767, pp. 4-39.) Unlike other intentional torts, in business torts the defendant's motive is crucial. (*Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 765-767 [206 Cal.Rptr. 354, 686 P.2d 1158].) The plaintiff must not only plead and prove intentional acts, but also that such acts were *designed* to disrupt the formation of a prospective economic relationship. (*Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827.) California courts have entertained suits for interference with contract or prospective economic advantage without inquiring into either the kind of statements the defendant made or the possibility that the First Amendment might limit the ability to maintain such causes of action. (E.g., *Herron* v. *State Farm Mutual Ins. Co., supra,* 56 Cal.2d at pp. 204-206; *Ernst & Ernst* v. *Carlson* (1966) 247 Cal.App.2d 125 [55 Cal.Rptr. 626]; *Lowell* v. *Mothers' Cake & Cookie Co., supra,* 79 Cal.App.3d 13.) Thus, case law suggests a plaintiff is not deprived of the cause of action for intentional interference with prospective economic advantage simply because the acts constituting the alleged interference were the expression of opinions.

*Blatty* v. *New York Times, supra,* 42 Cal.3d 1033, however, put a new gloss on California business tort law. Prior to *Blatty* it appeared that torts involving intentional interference could be accomplished by speech that would ordinarily be protected under the First Amendment, i.e., "by means otherwise lawful." (*Herron* v. *State Farm Mutual Ins. Co., supra,* 56 Cal.2d at p. 205.) *Blatty* repudiated this view by holding that the First Amendment necessarily comes into play when a media defendant is accused of publishing false statements that damage business interests. Irrespective of the label of "intentional interference with prospective economic advantage . . . [¶] . . . causes of action . . . hav[ing] as their gravamen the alleged injurious falsehood of a statement . . . must satisfy the requirements of the First Amendment." (42 Cal.3d at p. 1045.)

*Blatty, supra,* 42 Cal.3d 1033, which is the only California case discussing the First Amendment in connection with business torts, makes this important new point without elaboration and without reference to a body of business tort case law with which it appears inconsistent. In *Blatty,* the court found that the statements could not possibly meet the First Amendment's " 'of and concerning' requirement," because the alleged injury resulted from the failure to mention plaintiff's books in defendant's best seller list; accordingly, the court concluded that the cause of action for intentional interference with prospective economic advantage must fail. (*Id.,* at pp.

1046-1047, 1049.) The fact that, in the instant case, there is no question that respondents affirmatively referred to appellant's planned housing development does not make *Blatty* inapplicable; nor does the fact that respondent is not a media defendant. (*Miller* v. *Nestande* (1987) 192 Cal.App.3d 191, 198-200 [237 Cal.Rptr. 359, 62 A.L.R.4th 301].) ▆ *Blatty* applies here to the extent it bars appellant's cause of action for intentional interference with prospective economic advantage on the basis of statements consisting either of true facts or opinions. *Blatty* is not dispositive, however, because appellant's allegations go beyond injury through false statements to claim that respondents advanced opinions they did not genuinely hold for the sole purpose of harming appellant.

▆ In our view the recent United States Supreme Court opinion in *Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46 [99 L.Ed.2d 41, 108 S.Ct. 876], although concerned with a different tort, bars recovery for intentional injury to business interests alleged to result from the publication of a "false" or "dishonest" opinion regarding a land use determination. In *Hustler,* the court reversed an award of damages to the Reverend Jerry Falwell on his suit against a magazine for intentional infliction of emotional distress. (*Id.,* at pp. 56-57 [99 L.Ed.2d at pp. 52-53, 108 S.Ct. at pp. 882-883].) The emotional distress claim was based on " 'outrageous' conduct"—the publication of a parody of Falwell, which also had been the basis for a libel cause of action. (*Id.,* at pp. 57; 48-49 [99 L.Ed.2d at pp. 53; 47-48, 108 S.Ct. at pp. 883; 878].) The jury found against Falwell on the libel claim because "the ad parody could not 'reasonably be understood as describing actual facts about [Falwell] or actual events in which [he] participated.' " (*Id.,* at pp. 48-49 [99 L.Ed.2d at p. 47, 108 S.Ct. at p. 878].) However, the jury ruled for Falwell on his claim of intentional infliction of emotional distress, a judgment affirmed by the court of appeals. (*Falwell* v. *Flynt* (4th Cir. 1986) 797 F.2d 1270.) The Supreme Court reversed, reasoning that although admittedly offensive, the parody was a type of political cartoon, and that Falwell, a public figure, engendered "[t]he sort of robust political debate encouraged by the First Amendment [and] bound to produce speech that is critical of . . . public figures . . . ." (*Hustler Magazine* v. *Falwell, supra,* 485 U.S. at p. 51 [99 L.Ed.2d at p. 49, 108 S.Ct. at p. 879].)

The central issue in *Hustler* was whether the state's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protections to speech that is intended to inflict emotional injury even when that speech could not reasonably be construed as stating facts. Falwell's view, as characterized by the Supreme Court, was that "so long as the utterance was intended to inflict emotional distress, was outrageous, and did in fact inflict serious emotional distress, it is of no constitutional import whether the statement was a fact or an opinion, or whether it was true or false. It is the intent to cause injury that is the gravamen of the tort, and the

State's interest in preventing emotional harm simply outweighs whatever interest a speaker may have in speech of this type." (*Id.,* at p. __ [99 L.Ed.2d at p. 50, 108 S.Ct. at p. 880].) The Supreme Court rejected this view.

Reiterating that " '[f]reedoms of expression require " 'breathing space' " ' " (*Hustler, supra,* 485 U.S. at p. 52 [99 L.Ed.2d at p. 50, 108 S.Ct. at p. 880], quoting *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767, 772 [89 L.Ed.2d 783, 790, 106 S.Ct. 1558], quoting *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 272 [11 L.Ed.2d 686, 701, 84 S.Ct. 710, 95 A.L.R.2d 1412], quoting *N. A. A. C. P.* v. *Button* (1963) 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328]), the court reasoned that "in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment[;] . . . even when a speaker or writer is motivated by hatred or ill-will his expression [is] protected by the First Amendment . . . ." (485 U.S. at p. 53 [99 L.Ed.2d at p. 50, 108 S.Ct. at p. 880].) Thus, the Supreme Court concluded that public figures may not recover for the tort of intentional infliction of emotional distress caused by an offensive publication "without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' i.e., with knowledge that the statement was false or with reckless disregard as to whether or not it was true." (*Id.,* at p. 56 [99 L.Ed.2d at p. 52, 108 S.Ct. at p. 882].)

In the present case, as in *Hustler,* the gravamen of appellant's cause of action is the intent to cause injury. The fact that, unlike Reverend Falwell, appellant is alleging an economic rather than an emotional injury seems to us analytically irrelevant. However, whether the First Amendment applies to a private developer, such as appellant, in the same way it applies to a public figure, such as Falwell, warrants discussion.

■ Though nominally a private-figure plaintiff, for present purposes appellant possesses the attributes of a public figure. It is undisputed that, as described in the Chronicle article, appellant has actively and openly sought to influence public officials and in that manner affect the public decision process for determining the uses to which land in Contra Costa County may be put. In *Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537], which we think indistinguishable on this point, it was held that a private developer who sought zoning variances to build high-density housing "clearly fell within even the most restrictive definition of a 'public figure.' " (*Id.,* at p. 9 [26 L.Ed.2d at p. 12].) A developer who seeks necessary public approval for a construction project such as that involved in this case enters the public arena, invites public judgment, and is, for First Amendment purposes, similar to one who seeks government office. He "must accept certain necessary consequences of that involvement in public

affairs. He runs the risk of closer public scrutiny than might otherwise be the case." (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808]; see also *Afro-American Publishing Co.* v. *Jaffe* (D.C.Cir. 1966) 366 F.2d 649, 656-657 [366 F.2d 649], and cases there cited.)

Furthermore, appellant enjoyed "access to the channels of effective communication" regarding the dispute and thus had a "realistic opportunity to counteract false statements" (*Gertz, supra,* 418 U.S. at p. 344 [41 L.Ed.2d at p. 808]), which as *Gertz* emphasized, is characteristic of public figures. Eric Hasseltine, "a former Contra Costa supervisor now working for [appellant]," was quoted in the article as stating that: " 'What's unsafe about this is not the housing we're building and what we're doing . . . . The solution to the problem, if DuPont is not safe, is for them to improve their operation to the point that they are safe. We shouldn't be penalized and kept from using our property as we see fit.' " In response to the charge that appellant and other housing developers manipulate the planning process through political contributions, the article quoted Hasseltine as follows: " 'It's not that they're shopping for favors,' said Hasseltine, . . . . 'We're not looking for a rubber stamp or a free ride. It's obviously very much in the developers' interest that you have responsible, competent people in local office.' "

Thus, even if application of the First Amendment should turn primarily upon the plaintiff's status, as held in *Gertz,*[8] the status of the plaintiff in this case provides no reason to restrict application of the First Amendment.

Moreover, decisions of the United States Supreme Court rendered after *Gertz* establish that the status of the plaintiff is not the only consideration, and that the content of the speech is equally germane to the constitutional question.[9] (See, e.g., *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767, 775 [89 L.Ed.2d 783, 791-792].) One of the more important decisions emphasizing the importance of content is *Dun & Bradstreet* v. *Greenmoss Builders* (1985) 472 U.S. 749 [86 L.Ed.2d 593, 105 S.Ct. 2939], in which the plaintiff corporation sued a credit reporting agency for defamation for circulating a false report that the corporation had filed for bankruptcy. Although unable to agree on an opinion, five members of the court agreed that the rule of *Gertz* restricting damages for a libel that involved a matter of public concern has no application where the false and defamatory statements do not involve such matters. In emphasizing that "[i]t is speech

---

[8] This aspect of *Gertz* has been strongly criticized by some constitutional scholars. See, e.g., Franklin, *Constitutional Libel Law: The Role of Content* (1987) 34 U.C.L.A. L.Rev. 1657.

[9] A business tort, such as intentional interference with an economic relationship, though similar to a cause of action for defamation or invasion of privacy in that it may be accomplished through speech that offends the community sense of decency and fair play, is far more likely to be advanced by private than public figure plaintiffs. Therefore, whether any such tort cause of action is barred by the First Amendment is more likely to turn on the content of the speech than the status of the plaintiff.

on ' "matters of public concern" ' that is 'at the heart of the First Amendment's protection.' " *(Id.,* at pp. 758-759 [86 L.Ed.2d at p. 602], quoting *First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 776 [55 L.Ed.2d 707, 717, 98 S.Ct. 1407], citing *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 101 [84 L.Ed. 1093, 1101-1102, 60 S.Ct. 736]), the *Dun & Bradstreet* court quoted at length from the opinion two years earlier in *Connick* v. *Myers* (1983) 461 U.S. 138 [75 L.Ed.2d 708, 103 S.Ct. 1684]: "The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.' [Citations.] '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' [Citation.] Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the ' "highest rung of the hierarchy of First Amendment values" ' and is entitled to special protection. [Citations.]" *(Id.,* at p. 145 [75 L.Ed.2d at pp. 718-719].)

According to the plurality opinion in *Dun & Bradstreet, supra,* 472 U.S. 479, " '[w]hether . . . speech addresses a matter of public concern must be determined by [the expression's] content, form and context . . . as revealed by the whole record.' " *(Id.,* at p. 761 [86 L.Ed.2d at p. 604], quoting *Connick* v. *Myers, supra,* 461 U.S. at pp. 147-148 [75 L.Ed.2d at p. 720].) In the context in which it appeared, the speech with which we are here concerned pertained to two interrelated issues: most directly, the wisdom of the decision to permit construction of a housing development near a toxic chemical plant and, indirectly, the manner in which political contributions from developers may have influenced the county officials who made the land use decision. Issues of this sort are clearly entitled to the highest level of First Amendment protection. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, *the manner in which government is operated or should be operated, and all such matters relating to political processes."* *(Mills* v. *Alabama* (1966) 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 488, 86 S.Ct. 1434], italics added; accord *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886 [73 L.Ed.2d 1215, 102 S.Ct. 3409]; *Carey* v. *Brown* (1980) 447 U.S. 455, 467 [65 L.Ed.2d 263, 273-274, 100 S.Ct. 2286]; *Landmark Communications, Inc.* v. *Virginia* (1978) 435 U.S. 829 [56 L.Ed.2d 1, 98 S.Ct. 1535]; *First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. 765; *Nebraska Press Assn.* v. *Stuart* (1976) 427 U.S. 539 [49 L.Ed.2d 683, 96 S.Ct. 2791]; *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612]; *New York Times Co.* v. *United States* (1971) 403 U.S. 713 [29 L.Ed.2d 822, 91 S.Ct. 2140].)

One of the justifications for assiduously protecting speech that relates to governmental affairs is that the public needs information of this sort to

rationally evaluate or "check" the conduct of elected officials. (See Blasi, *The Checking Value in First Amendment Theory* (1977) Am. B. Found. Res. J. 521.) It is irrelevant to the achievement of this constitutional purpose whether plaintiff is a public figure. The defendants nonmedia status is similarly beside the point. (*Miller* v. *Nestande, supra,* 192 Cal.App.3d at pp. 198-200.) As the United States Supreme Court has pointed out, "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source . . . ." (*First National Bank of Boston* v. *Bellotti, supra,* 435 U.S. at p. 777 [55 L.Ed.2d at p. 718].)

We do not mean to suggest that all speech relating to governmental affairs is automatically entitled to the highest level of constitutional protection, or to any protection. It is possible to conceive of speech concerning aspects of government that do not genuinely implicate any broad public interest nor materially enhance the self-governing ability of the public. However, as we have pointed out, the speech comprising the intentional tort alleged in this case does not relate to the conduct of low level civil servants regarding a matter of concern to few, but the exercise of power by elected officials on a matter of broad public interest. (See *Greenbelt Pub. Assn.* v. *Bresler, supra,* 398 U.S. at p. 14 [26 L.Ed.2d at p. 15]; *Okun* v. *Superior Court, supra,* 29 Cal.3d at pp. 448-449; *Blackhawk Corp.* v. *Ewing* (1979) 94 Cal.App.3d 640, 642, 644 [156 Cal.Rptr. 581], where allegedly defamatory statements were held privileged in the context of zoning and land development disputes.)

As applied to speech·involving matters of public concern, appellant's theory, in effect, that "dishonest" opinions are equivalent to false statements of fact would undermine the First Amendment in the area of its most important application, because it would permit a plaintiff to compel a defendant engaged in public debate to endure trial merely by asserting that his stated opinions were not truly held—something extremely difficult to prove or disprove. If the state of mind of one who advances a critical opinion could so easily be placed at issue, speaking one's mind on controversial public issues would become a dangerous enterprise, a state of affairs manifestly incompatible with our present concept of free speech.[10]

---

[10] Cases indicating that speech may be unprotected if the plaintiff can prove it consists of insincere opinions were for the most part decided before the common law fair-comment privilege was preempted by the constitutional developments that culminated in *Gertz, supra,* 418 U.S. 323. (See, e.g., *Briarcliff Lodge Hotel, Inc.* v. *Citizen-Sentinel Publishers* (1932) 260 N.Y. 106, 118 [183 N.E. 193, 198] ["A comment is fair when it is based on facts truly stated and free from imputations of corrupt or dishonorable motives on the part of the person whose conduct is criticized, and is an honest expression of the writer's real opinion or belief."]; accord, *Leers* v. *Green* (1957) 24 N.J. 239 [131 A.2d 781, 789]; *Fisher* v. *Washington Post Company* (D.C.App. 1965) 212 A.2d 335, 337; Rest., Torts (1938) § 606(1)(b); see also, *Sierra Breeze* v. *Superior Court* (1978) 86 Cal.App.3d 102, 107 [149 Cal.Rptr. 914].)

■ It does not matter whether respondents' speech was motivated by economic self-interest, because motives are irrelevant when it comes to public debate. (*Hustler Magazine* v. *Falwell, supra,* 485 U.S. at p. 52 [99 L.Ed.2d at pp. 49-50, 108 S.Ct. at p. 880]; see also, *Ginzburg* v. *United States* (1966) 383 U.S. 463, 474-475 [16 L.Ed.2d 31, 40-41, 86 S.Ct. 942] and *New York Times Co.* v. *Sullivan, supra,* 376 U.S. at pp. 265-266 [11 L.Ed.2d at pp. 697-698], suggesting that the profit motive does not diminish the extent of free speech protection otherwise available.)[11]   ■   The devil's advocate who champions a point of view he does not truly hold can make a valuable contribution to the quality of public discussion. Thus, with respect to matters of public concern, "opinions, even if falsely and insincerely held, are constitutionally protected . . . ." (*Rinaldi* v. *Holt, Rinehart & Winston, Inc.* (1977) 42 N.Y.2d 369 [397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306].)[12]

The trial court properly sustained the demurrers to appellant's complaints, and appellant has not shown that it could state a cause of action by further amendments. Accordingly, the judgment is affirmed.

Rouse, J., and Smith, J., concurred.

---

[11] It is true that the *Hustler* court went on to quote an earlier Supreme Court opinion which referred to " 'utterances honestly believed' " which " 'contribute to the free interchange of ideas and the ascertainment of truth' " even when spoken " 'out of hatred. . . .' " (*Hustler, supra,* 485 U.S. at pp. 52-53 [99 L.Ed.2d at p. 50, 108 S.Ct. at pp. 880-881], quoting *Garrison* v. *Louisiana* (1964) 379 U.S. 64, 73 [13 L.Ed.2d 125, 132, 85 S.Ct. 209].) This reference cannot reasonably be thought to diminish the *Hustler* court's definitive rejection of motive as a relevant consideration in the context of that case.

[12] The quoted statement from *Rinaldi* that even insincere opinions are protected is followed by the proviso that "the facts supporting the opinions are set forth." (366 N.E.2d at p. 1306.) However, as one commentator has observed about this aspect of the opinion, "The facts may be false if the plaintiff is a public official or public figure and the falsity does not result from 'actual malice' under the *New York Times* rule. The [*Rinaldi*] requirement seems to have been adopted from the 'fact truly stated' requirement of the common law. It is arguable that, after *Gertz, all* opinion is protected, irrespective of whether the underlying facts are set forth . . . and that *Rinaldi* was mistaken to the extent it suggested otherwise." (Sack, *Libel, Slander and Related Problems* (1980) p. 177, fn. 122.)