[No. F019980. Fifth Dist. Feb. 5, 1996.]

WESTSIDE CENTER ASSOCIATES, Plaintiff and Appellant, v.
SAFEWAY STORES 23, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of part III B.

508

## COUNSEL

Klein, Wegis, DeNatale, Hall, Goldner & Muir, David J. Cooper and David L. Saine for Plaintiff and Appellant.

Fenton & Keller and Larry E. Hayes for Defendants and Appellants.

## OPINION

**MARTIN, Acting P. J.**—This appeal involves a neighborhood shopping center in the Kern County community of Taft. The anchor position at the center was occupied for many years by a Safeway supermarket in which the various defendants (identified collectively as Safeway) have held an interest at some point. Safeway leased the building from a series of owners, none of which is still a party to this action. Ownership of the remainder of the center, consisting of numerous smaller stores, also passed through several hands before being acquired by the plaintiff, a partnership known as Westside Center Associates (WCA). Thus the shopping center was "fragmented" in that parts of it were owned by different entities; significantly, WCA never owned the Safeway building. It was in this configuration that the present dispute arose.

Citing a loss of profitability, Safeway closed the supermarket in 1987 with about 15 months left on its 20-year lease. Business at the rest of the center suffered as a result. About a year later, Safeway removed all the store fixtures. Soon after that, although it had no plans to reopen the supermarket and the parties had been unable to find a suitable replacement tenant, Safeway executed its option to renew the lease for an additional five years.

The anchor position remained vacant. Faced with foreclosure, WCA sold its interest in the center in 1989 at what it claims was a loss of more than $2 million. It subsequently sued Safeway for damages alleging breach of an implied covenant to remain in operation throughout the lease period, and for tortious interference with prospective economic advantage. WCA contended the Safeway defendants had conspired to close the supermarket and keep the building vacant in order to drive down the value of the center. They then hoped, according to WCA, to buy the property at an artificially low price, bring in a new anchor tenant, and profit from the center's resulting recovery.

The trial court granted judgment in favor of Safeway on all causes of action following lengthy pretrial proceedings in which the court was called upon to decide various questions of law based upon stipulated facts and offers of proof. WCA challenges several of the court's rulings on appeal. We affirm the judgment.

### I. FACTUAL BACKGROUND

The shopping center site was purchased in 1964 by Westside Center, a joint venture consisting of Ernest W. Hahn, Inc., a large shopping center developer, and Lester Causey and Don Rook, two commercial real estate

brokers in Taft. Westside Center, in turn, agreed to construct and lease two adjacent buildings in the proposed development to Safeway Stores, Inc., for a Safeway supermarket and a Super S drug store. The two stores were to serve as the center's anchor tenants; together they would occupy nearly 50,000 square feet, or about 40 percent of the projected retail space. The rest of the property was to be occupied by local businesses and smaller chain stores.

The anchor tenant at a neighborhood shopping center is commonly regarded within the industry as an important if not crucial element in the center's success. It attracts shoppers who also can be expected to patronize the satellite stores which, if things go as planned, generate much of the owner's profit by filling the remaining space and paying rents based on the added business drawn by the anchor. Given its importance, the anchor tenant is typically able to acquire space in the center on more favorable terms than the other tenants. That was true at the Taft center.

Westside Center signed two 20-year leases with Safeway in 1964, to be effective when Safeway took possession of the completed buildings (in mid-1966). The leases required Safeway to pay a minimum base rent increasing to $75,588 per year by the fifth year and remaining constant thereafter, plus an additional amount based on a percentage of the stores' gross sales.[1] Safeway also reserved the option of renewing the leases on the same terms for up to four additional five-year periods,[2] effectively locking in the favorable rental rates for up to forty years. Moreover, unlike some other tenants, Safeway's leases did not expressly require it to remain in operation throughout the lease period nor restrict its use of the buildings to certain purposes.

Safeway's preeminent role as the anchor tenant was further reflected in a second related agreement signed the same day between it and Westside Center entitled a "Grant of Easements and Declaration of Restrictions" (CC&Rs). Anticipating the possibility that ownership of the center might be

---

[1]However, the leases also provided that "Lessee makes no representation or warranty as to the sales which it expects to make in the leased premises."

The base rent typically covered little more than the developer's loan payments; its profits were expected to come from the anchor tenant's percentage rent as well as the rent paid by the satellite tenants. But there was some dispute about whether that was true in this case in light of evidence the base rent provided an additional profitable return on Westside Center's investment.

[2]Paragraph 16 of the lease provided: "*Options for renewal.* Lessee, at its option, may extend the term of this lease for four (4) separate and additional periods of five (5) years each on the same terms and conditions by notice to Lessor at least sixty (60) days before the expiration of the term or option term then in effect."

divided, the agreement generally set out the rights and obligations of the owners with respect to one another. In addition, it restricted their right to use the center to sell groceries or prescription drugs in competition with Safeway and Super S. The CC&Rs did not impose any comparable restrictions on Safeway's use of the leased buildings.[3]

In 1971, Westside Center sold its interest in the Safeway and Super S buildings to the Alameda Amusement Company which, in turn, sold the property to the Osugi family some two years later for $966,000. In 1974, Safeway removed the common wall between the two stores and consolidated their operation into a single expanded supermarket. Safeway and the Osugis modified the lease accordingly and in the process also extended it to June 30, 1988. Safeway's base rent, $75,588 per year, stayed the same; Safeway also remained liable for percentage rent although the amount was determined by a somewhat different formula than before. Later that same year, the Osugis transferred the store property to a trust administered first by the Bank of America and later by Wells Fargo Bank.

In 1982, Ernest W. Hahn, Inc., which had since become the sole owner of Westside Center, sold its remaining interest in the center (i.e., that portion exclusive of the Safeway building) to Ralph Wegis and Wayne Stewart for $750,000. They transferred it in 1984 to the plaintiff, WCA, a partnership made up of Wegis, Don Rook (who had been a partner in the original Westside Center), and Leonard Gentieu.

During the next two years, WCA remodeled the center (including the Safeway building) with a $3.1 million loan from the Torrey Pines Bank. Among other things, WCA added a Payless drug store in 1985, a change which required WCA, Safeway, and the Osugi trust to modify the CC&Rs to remove the restriction on sales in competition with Safeway. An appraisal done in 1986 in connection with the loan put the value of WCA's property at $5,250,000.

The remodeling was spurred in part by the anticipated development of a second shopping center nearby to be anchored by a Lucky's supermarket. The Lucky's center opened in 1986. Coincidentally the local economy declined in Taft, a community closely tied to the oil industry. Sales at the Safeway supermarket declined significantly over the rest of the year. Citing its losses, Safeway closed the Taft store in March of 1987 along with several others in its Southern California region.

---

[3]The leases and CC&Rs were modified several times while the center was under development. The changes did not alter the provisions pertinent to the issues before us.

Closure of the supermarket, in turn, hurt business in WCA's portion of the shopping center. Some of the satellite stores closed; others sought and received rent concessions. As a result, WCA had trouble making its loan payments. In August 1987, it listed its property for sale for $4 million. It also made various unsuccessful attempts to locate a new anchor tenant. The most suitable prospect was thought to be a smaller regional grocery chain such as Save Mart rather than a national chain like Safeway. And there was apparent agreement the success of any effort to replace Safeway would depend to a large degree upon unifying ownership of the center. Accordingly, that possibility was explored in various discussions between WCA, Safeway, and the Osugi trust.

The role taken by Safeway in the search for a new anchor tenant was generally unremarkable in the first year following closure of the supermarket. Safeway transferred its leasehold interest to its nonoperating properties division, which listed the store with a commercial real estate broker. Safeway's primary options at that point were to sublet or assign its lease to another grocery chain[4] or simply to allow the lease to expire as scheduled on June 30, 1988. By the end of 1987, however, Safeway's actions took what WCA perceived to be a decidedly more sinister turn.

According to WCA, Safeway made the decision to close the supermarket shortly after Safeway was acquired in a leveraged corporate buyout in 1986. The new owner allegedly decided to shift the company's focus in part from operating retail grocery stores to speculating in real estate by exploiting the value of its long-term leaseholds. It took what WCA claims was a first step in that direction by creating a separate subsidiary, the defendant Property Development Associates (PDA), to manage its many vacant stores, including the one in Taft. And it hired Joseph Bryne as the president of PDA in February 1988.

Bryne previously had been the president of Glickman, Bryne & Associates, a firm which developed and managed shopping centers in the western United States. Upon his move to PDA, Bryne was replaced by Kris Hoffman who had been an executive with Save Mart. By WCA's reckoning, Bryne and Hoffman soon devised the following scheme to take over the Taft center: Bryne would use his control of the Safeway leasehold to frustrate any

---

[4]Paragraph 13 of the lease provided: "*Assignment and subletting.* Lessee shall not assign this lease nor sublet the leased premises without Lessor's written consent, which shall not be unreasonably withheld, except that Lessee may, without Lessor's consent, assign this lease or sublet the leased premises to any affiliated or successor company, or sublet portions of the leased premises to concessionaires. If Lessee assigns this lease, Lessee shall remain liable to Lessor for full performance of Lessee's obligations."

efforts by WCA to attract a new anchor tenant, thereby driving down the value of the center and eventually forcing WCA to sell its interest to Hoffman at an artificially low price; Hoffman would then use his industry connections, along with his ability to offer favorable rates to sublease the Safeway building, to induce Save Mart to move into the empty store; with a new anchor tenant, the surrounding center would regain its former value, thus allowing Bryne and Hoffman (i.e., Safeway and Glickman) to reap a substantial profit within a few years.

Byrne and Hoffman, in deposition testimony, confirmed having had some discussions about how they might attract Save Mart to the center. They acknowledged Hoffman would have the incentive to put together such a deal only if he stood to profit from the appreciated value of the surrounding center which the deal could be expected to create. This was particularly true, they explained, in light of all the financial inducements Hoffman would have to offer Save Mart to convince it to accept what it had already concluded was a marginal business opportunity.

WCA found additional support for its conspiracy theory in events which occurred after Bryne's arrival at PDA. One in particular was Safeway's decision to remove the fixtures from the vacant store in March of 1988.[5] There is little dispute the cost of buying and installing new fixtures made the building less attractive to the sort of grocery chain considered likely to replace Safeway. Indeed, Bryne said he had directed the fixtures be retained to avoid that very problem, but his order was not conveyed to the division within Safeway responsible for removing them. He described the miscommunication as "significant and bewildering." And, ironically, Kris Hoffman stated it was Safeway's removal of the fixtures that ultimately caused him to abandon his efforts to put together a deal for the store.

In March and April of 1988, WCA negotiated with the Osugi trust to buy the Safeway property. It offered to pay $750,000 if Safeway exercised its option to renew the lease (due to expire at the end of June) and $500,000 if it did not. The trust countered with an offer to sell the property for $750,000 irrespective of Safeway's decision. WCA accepted the counteroffer. Safeway, which had been made aware of the negotiations by WCA, exercised its

---

[5]Paragraph 9 of the lease provided: *"Lessee's Fixtures.* Lessee may install in the leased premises such fixtures and equipment as Lessee deems desirable and all of said items shall remain Lessee's property whether or not affixed or attached to the leased premises. Lessee may remove said items from the leased premises at any time, but shall repair any damage caused by removal."

option about a week later, on April 19.[6] The Osugi trust subsequently withdrew from the deal, believing Safeway's action indicated it expected to sublease the store building.

Joseph Bryne testified he exercised the option because he thought the leasehold still had value, which he put at about $200,000, attributable to the below-market rental rates. The base rent represented a charge of $1.50 per square foot for space Bryne felt would fetch $4. He believed a new anchor still could be found and so hoped to exploit the difference by retaining control of the building.

While the negotiations between WCA and the Osugi trust were still underway, Kris Hoffman offered to buy WCA's interest in the shopping center for $3,250,000, or about $150,000 more than WCA's loan. The offer was subject to several conditions, including that Hoffman receive a written commitment from a supermarket to occupy the Safeway building; that he receive a written commitment from Safeway to convey its leasehold to him;[7] and that WCA obtain an assignable option to purchase the building from the Osugi trust for no more than $750,000. Nothing came of the offer because, among other reasons, WCA was unwilling to sell at Hoffman's price and because Save Mart lost interest in the store when it learned the fixtures had been removed. Moreover, as noted, the Osugi trust subsequently elected not to sell the store building after Safeway renewed its lease.

Others beside Hoffman also expressed some interest in buying the shopping center but likewise were unwilling to make a deal without an anchor tenant or at least without ownership or control of the entire property.

WCA had by this time fallen behind in its loan payments to Torrey Pines Bank, which instituted foreclosure proceedings in early 1987. WCA eventually reached an agreement with the bank by which WCA, in November of 1989, sold its interest in the shopping center to a group unrelated to any of the Safeway defendants for $2,990,000, an amount equal to the loan balance less a deficiency payment.

## II. THE PROCEEDINGS BELOW

WCA initiated the present action in 1990 by filing a complaint for damages against Safeway Stores, Inc., and Wells Fargo Bank (directly and

---

[6]Safeway's right to exercise the option was set to expire about two weeks later in early May.

[7]Hoffman had, at that point, received assurances from Safeway (i.e., from Bryne) that it would exercise its option to renew the lease. Thus, according to Hoffman, the one part of the deal he could be sure of was that he would be able to acquire Safeway's leasehold interest.

as trustee for the Osugi trust). WCA later amended the complaint to include the additional Safeway defendants. It eventually moved to dismiss the suit against Wells Fargo after the two parties reached a settlement.

The second amended complaint, filed December 3, 1991, asserted five causes of action: breach by all defendants of an implied covenant in the CC&Rs to operate a supermarket in the Safeway building for the entire term of the lease;[8] breach by Wells Fargo of an implied promise in the CC&Rs to take all steps necessary to enforce Safeway's duty to operate a supermarket; breach by all defendants of an implied covenant of continued operation in the lease (to which WCA claimed to be a third party beneficiary); conspiracy by all defendants to interfere with WCA's prospective economic advantage; and negligent interference with prospective economic advantage by all defendants. Inasmuch as WCA challenges the trial court's rulings only with respect to the first, third, and fourth causes of action, we need not address the other two in the discussion which follows.

After extensive discovery, Safeway moved for summary judgment or summary adjudication of issues. An exhaustive exchange of pleadings followed whereupon the court (Judge Westra) denied the motion. This court denied Safeway's petition for a writ of mandate directing the lower court to grant the motion. Safeway then filed a motion for judgment on the pleadings, which also was denied.

The parties next agreed to a procedure whereby the trial court (Judge McGillivray) would decide certain disputed issues of law based upon stipulated facts relating to the circumstances under which the original lease and CC&Rs were signed, as well as WCA's offer of proof setting out expected expert testimony about the industry understanding of an anchor tenant's role in a neighborhood shopping center. This procedure produced a series of hearings and rulings dealing first with the contract and then with the tort causes of action.

On the question of whether the 1964 lease and CC&Rs contained an implied covenant of continued operation, the court considered the two

---

[8]WCA has described the duty purportedly created by the implied covenant in several different ways ranging from the specific to the general: a duty to operate a supermarket throughout the lease period; a duty to make a reasonable effort in that regard; a duty to make some reasonable use of the premises if not as a supermarket; a duty to cooperate with efforts to find a replacement tenant; and a duty to act in a commercially reasonable manner. According to WCA, this duty could be implied from the circumstances surrounding execution of the lease and CC&Rs. Alternatively, it claims a similar duty arose from the covenant of good faith and fair dealing implied by law in every contract. References in the ensuing discussion to an implied covenant of continued operation is intended to apply to all these various formulations unless indicated otherwise.

documents together as a single integrated agreement. It found the original parties to the agreement (Westside Center and Safeway) had intentionally omitted any restriction on Safeway's use of the store building or requirement that it continue in operation throughout the lease period. This omission, it concluded, overcame any inference that Safeway, because of its vital role as the anchor tenant, had impliedly agreed to remain in business at the center.[9]

The court then took up the subject of use restrictions, i.e., whether statutory or common law imposed on Safeway a requirement to use the store building in a reasonable manner (and specifically to remain in business) irrespective of any express or implied covenant. The court concluded that, absent a specific provision in the lease, Civil Code section 1997.210, subdivision (b),[10] limits a tenant to reasonable uses of property but does not require the tenant to put the property to *some* use. That is, the law did not prevent Safeway from putting the store building to no use at all by closing the business.

Still on the subject of use restrictions, the court next considered the lease provisions granting Safeway the right to remove the store fixtures and to renew the lease. It was asked to decide whether Safeway had impliedly agreed, consistent with the custom and practice within the shopping center industry, to exercise these rights in a reasonable manner, or whether such a duty was imposed on it by the implied covenant of good faith and fair dealing. The court decided the lease granted Safeway the unrestricted right to deal with the fixtures in whatever manner it wished, but obliged it to exercise the renewal clause in good faith.

It remained to be determined, however, whether WCA had standing as a third party beneficiary of the lease to enforce this obligation. The court held

---

[9]WCA later argued the operable agreement was not the 1964 Safeway lease with Westside Center but the 1974 lease modification with the Osugi family. It claimed the altered percentage rent provisions reflected a newly implied promise by Safeway to continue in operation. In support of this contention, WCA offered the Osugis' declaration in which they stated they would not have purchased the store building or revised the lease but for their expectation that Safeway would operate continuously during the entire term of the lease. However, the court concluded the 1974 modification did not materially change the original lease and therefore did not create any new duties by implication.

[10]Civil Code section 1997.210, which was enacted effective January 1, 1992, and purportedly reflects the preexisting common law rule, provides: "(a) Subject to the limitations of this chapter, a lease may include a restriction on use of leased property by a tenant. [¶] (b) Unless the lease includes a restriction on use, a tenant's rights under a lease include any reasonable use of the leased property." A use restriction is defined to include provisions "limiting use to a specified purpose, mandating use for a specified purpose, prohibiting use for a specified purpose, limiting or prohibiting a change in use, or otherwise." (Civ. Code, § 1997.020, subd. (c).)

it did not. It reasoned Westside Center, as the original owner of the Safeway building, had not intended to extend the benefits of the lease to itself as the owner of the rest of the shopping center. And it held nothing in the CC&Rs conferred standing on WCA to enforce the lease provisions.

At this point the focus of the proceedings shifted to WCA's fourth and fifth causes of action for intentional and negligent interference with prospective economic advantage. The court concluded the circumstances did not give rise to a duty of care sufficient to support WCA's negligence claim. But it held Safeway was obliged, absent some recognized privilege or justification, to refrain from intentionally disrupting WCA's business relationships.

The court then made several preliminary rulings affecting the scope of the argument on this subject. It granted Safeway's motion *in limine* to restrict the prospective testimony of WCA's expert witnesses in certain areas.[11] And it decided various questions raised by the parties' proposed jury instructions.[12] Most significantly, the court held a plaintiff asserting intentional interference with prospective economic advantage must prove the defendant acted with the intent to disrupt an existing relationship with a particular third party as opposed to a prospective relationship with an unknown class of potential buyers or investors.[13]

As they had with the contract causes of action, the parties then asked the court to decide certain legal questions based upon agreed facts and offers of proof. WCA submitted an "offer of proof" recounting its conspiracy theory outlined above; it asserted Safeway had intentionally interfered with WCA's ability to sell its portion of the shopping center in three ways: by closing the supermarket, by removing the fixtures, and by exercising its option to renew the lease. Safeway countered with a trial brief and its own "offer of proof" which likewise consisted more of arguments than of proposed facts. WCA

---

[11]The court limited expert testimony with respect to: Safeway's alleged failure to give WCA adequate notice of its intention to close the store; WCA's expenditure of $150,000 in 1985 to remodel the Safeway building; Joseph Bryne's character for tough bargaining; and the leveraged buyout of Safeway. WCA made motions *in limine* to exclude evidence of the following: events which occurred after WCA sold its shopping center property in 1989; the adequacy of the base rent provided in the 1964 Safeway lease and the lessor's return on investment; and the terms of the settlement between WCA and Wells Fargo. There is no indication in the record that the court ever actually ruled on these latter motions.

[12]The discussion about jury instructions was not recorded. However, a brief summary of the parties' arguments and the court's conclusions was subsequently entered in the record.

[13]The other instructions concerned the extent of the disruption which must be proved, i.e., whether the interference must have prevented the formation or continuation of an economic relationship or merely made it more expensive or burdensome, and the defenses of privilege and justification.

objected to Safeway's offer of proof but later joined in a stipulation permitting the court to consider it along with those facts which were undisputed.

The question of what facts were properly before the court arose from a disagreement about the nature of the proceedings at that point. WCA interpreted Safeway's trial brief as, in effect, a generic motion to dispose of the fourth cause of action. After some discussion about whether to characterize it as a motion *in limine*, a motion for nonsuit, or a motion for a directed verdict, the parties went forward on the basis that the appropriate test was the same in any case: whether the proffered facts, if proven at trial, would support a verdict for WCA, i.e., whether there was any substantial evidence to support WCA's claim.

In light of the court's previous ruling limiting WCA's proof to a specific economic relationship, the ensuing argument focused on whether Safeway, by exercising its option to renew the lease, had intentionally interfered with the pending deal between WCA and Wells Fargo for the sale of the Safeway building and, if so, the type and extent of WCA's resulting damages. The court held there was no substantial evidence Safeway had intentionally interfered with a particular economic relationship, or that its conduct had damaged WCA in any event. Assuming arguendo WCA had been harmed, the court also held WCA had failed to establish the nature and extent of its damages with sufficient certainty.

Having thus disposed of all WCA's claims, the court granted Safeway's "Motion for Nonsuit/Directed Verdict/Motion in Limine" with respect to the first, third, fourth, and fifth causes of action (the second cause of action against Wells Fargo already having been dismissed). Judgment in favor of Safeway was entered accordingly. WCA filed a timely notice of appeal. Safeway filed a notice purporting to cross-appeal from the denial of its motions for summary judgment, judgment on the pleadings, and nonsuit.[14]

---

[14]Even were we to treat Safeway's cross-appeal as having been taken from the judgment rather than from a nonappealable order (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 82, 87, pp. 104-105, 108-109), Safeway fails to show it was in any way aggrieved by a judgment entirely in its favor. (Code Civ. Proc., § 902; *Hensley* v. *Hensley* (1987) 190 Cal.App.3d 895, 898 [235 Cal.Rptr. 684].) Indeed, Safeway offers no argument in support of its cross-appeal other than to claim any error in the judgment was harmless because the court should have granted its motion for summary judgment for the reasons set out in its voluminous petition for writ of mandate. (See *MST Farms* v. *C.G. 1464* (1988) 204 Cal.App.3d 304, 306 [251 Cal.Rptr. 72] ["court is not required to discuss or consider points which are not argued or which are not supported by citation to authorities or the record"].) For these reasons, Safeway's cross-appeal will be dismissed.

## III. Discussion

### A. *Intentional Interference With Prospective Economic Advantage*

WCA challenges certain of the court's rulings on both its tort and contract claims. With regard to its claim for intentional interference with prospective economic advantage, WCA contends the court erroneously limited its offer of proof to Safeway's disruption of a particular relationship with a known third party.[15] WCA identified only one such relationship—its unsuccessful negotiations with the Osugi trust to purchase the Safeway building. Nevertheless, WCA argues Safeway was potentially liable for interfering with a broader range of prospective relationships—those involving the class of all possible but as yet unidentified tenants or buyers for WCA's portion of the shopping center.

WCA also disputes the court's rulings on the subject of the damages, if any, caused by the interference. It asserts the proffered facts were sufficient, at least for the purpose of overcoming Safeway's motion, to establish both the fact and the extent of its injury. Although WCA would treat the matters separately, the need to prove interference with a particular relationship and the need to prove damages with reasonable certainty are interrelated, as we explain below.

### (1) *Prospective Economic Relationships*

"[T]he common law on the tort of intentional interference with prospective economic advantage, both in American jurisdictions generally and in California specifically, is fast approaching incoherence." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 394 [45 Cal.Rptr.2d 436, 902 P.2d 740] (conc. opn. of Mosk, J.).)

Liability for interference with prospective advantage has evolved as a broader application of the principles underlying the tort of interference with contract. (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 129, p. 981; *id.*, § 130, p. 1005; 5 Witkin, Summary of Cal. Law (9th ed. 1990) Torts, § 652, p. 740.) That is, the "more inclusive" tort protects the *expectation* of an advantageous business relation even in the absence of an existing, legally

---

[15]In summarizing the previous unrecorded discussion about proposed jury instructions, the court described its ruling on this subject as follows: "The language that I think I used . . . was that I would find it appropriate to instruct in accordance with the defendant's position . . . as I understood it that plaintiff must show a specific intent to interfere with a specific prospective relationship not with a class of unknown investors or purchasers."

binding agreement. (*Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 822-823 [122 Cal.Rptr. 745, 537 P.2d 865], disapproved on other grounds in *Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at p. 393, fn. 5; *Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491, 501 [198 Cal.Rptr. 829]; *Lowell* v. *Mother's Cake & Cookie Co.* (1978) 79 Cal.App.3d 13, 17 [144 Cal.Rptr. 664].) The two causes of action are similar in many other respects, although the law recognizes a wider range of justification for intrusion into relations which are merely prospective. (*Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1126 [270 Cal.Rptr. 1, 791 P.2d 587].) Commenting on this distinction, our Supreme Court has recently observed: "A doctrine that blurs the analytical line between interference with an existing business contract and interference with commercial relations *less* than contractual is one that invites both uncertainty in conduct and unpredictability of its legal effect. The notion that inducing the breach of an existing contract is simply a subevent of the 'more inclusive' class of acts that interfere with economic relations, while perhaps theoretically unobjectionable, has been mischievous as a practical matter. Our courts should, in short, firmly distinguish the two kinds of business contexts, bringing a greater solicitude to those relationships that have ripened into agreements, while recognizing that relationships short of that subsist in a zone where the rewards and risks of competition are dominant." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at p. 392.)[16]

 The elements of intentional interference with prospective economic advantage have been stated as follows: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the

---

[16]In *Della Penna,* the court was asked to resolve a long-standing disagreement about the proper allocation of the burden of proof with respect to justification for interference with prospective relations. Justification, in turn, has been said to turn primarily on the motive behind the defendant's interference and the means used to accomplish it. (See, e.g., *Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 18-21.) The *Della Penna* court disapproved the view treating justification as an affirmative defense. In light of the particular importance of free competition in the area of noncontractual business relations, it held instead that ". . . a plaintiff seeking to recover for an alleged interference with prospective contractual or economic relations must plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at p. 393.) The court left the question of what constitutes such wrongful conduct for "another day and a more appropriate case." (*Ibid.*)

Retroactive application of this rule (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra,* 11 Cal.4th at p. 391, fn. 4) does not affect our analysis in this case. Notwithstanding the parties' efforts to inject Safeway's motives into their arguments, justification is not an issue directly before us, and we need not consider it in light of our resolution of the other issues raised by the appeal.

relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." (*Youst* v. *Longo* (1987) 43 Cal.3d 64, 71, fn. 6 [233 Cal.Rptr. 294, 729 P.2d 728, 85 A.L.R.4th 1025]; *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 330 [216 Cal.Rptr. 718, 703 P.2d 58]; *Buckaloo* v. *Johnson, supra*, 14 Cal.3d at p. 827.)[17]

Where a contract exists, it identifies the particular interest with which the defendant has allegedly interfered and hence serves to establish both the fact and the amount of the plaintiff's resulting damages. For similar reasons, the sort of "expectancies" the law typically protects are those of future contractual relations. (*Youst* v. *Longo, supra*, 43 Cal.3d at p. 75.) "In such cases there is a background of business experience on the basis of which it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered." (Prosser & Keeton, The Law of Torts, *supra*, § 130, p. 1006; see also 2 Harper et al., The Law of Torts (2d ed. 1986) § 6.11, p. 345.)

Nonetheless, the chance the expectancy otherwise would have occurred is necessarily a matter of some uncertainty. The law precludes recovery for overly speculative expectancies by initially requiring proof the business relationship contained " 'the *probability* of future economic benefit to the plaintiff.' " (*Youst* v. *Longo, supra*, 43 Cal.3d at p. 71; see also *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra*, 50 Cal.3d at pp. 1136-1137.) "Although varying language has been used to express this threshold requirement, the cases generally agree it must be reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." (*Youst* v. *Longo, supra*, 43 Cal.3d at p. 71.) The question before us is whether it is possible to establish this level of certainty for a purely hypothetical relationship.

---

[17]The elements first appeared in this form in *Buckaloo* v. *Johnson, supra*, 14 Cal.3d at page 827 which, along with *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752 [206 Cal.Rptr. 354, 686 P.2d 1158], was disapproved in *Della Penna* "to the extent that language in [those decisions] addressing the pleading and proof requirements in the economic relations tort is inconsistent with the formulation we adopt in this case . . . ." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc., supra*, 11 Cal.4th at p. 393, fn. 5.) The *Della Penna* court approved a modified version of the standard jury instruction on intentional interference, BAJI No. 7.82, which changed the third element to provide that the defendant " 'intentionally engaged in [*wrongful*] acts or conduct designed to interfere with or disrupt' the relationship." (11 Cal.4th at p. 380, fn. 1.)

### (2) *Interference With the Market*

WCA claims Safeway interfered in its relationship with the class of all potential buyers for its property and thereby reduced the property's market value. Or in the language of two decisions upon which WCA relies, Safeway interfered not with a particular sale but with WCA's "opportunity" to sell the property for its true value.

In *Gold* v. *Los Angeles Democratic League* (1975) 49 Cal.App.3d 365 [122 Cal.Rptr. 732], the plaintiff was an unsuccessful candidate for elective office. He brought an action alleging the defendants had tortiously interfered with his prospective employment by mailing out false and misleading voter pamphlets endorsing his opponent. The trial court sustained the defendants' demurrer but a majority of the appellate court, without discussing the plaintiff's chance of actually winning the election, held the allegations stated a cause of action for interference with the plaintiff's "opportunity to be elected" to the office. (*Id.* at p. 375.)

In *Smith* v. *Superior Court, supra,* 151 Cal.App.3d 491, the plaintiffs sued an automobile dealer who reneged on a promise to preserve physical evidence from an accident in which the plaintiffs had been injured. The trial court sustained the dealer's demurrer to a claim for " 'Tortious Interference with Prospective Civil Action By Spoliation of Evidence,' " ruling no such tort existed. The appellate court disagreed, analogizing the claim to one for intentional interference with prospective economic advantage and concluding the plaintiffs' right to bring an action for their injuries was a valuable expectancy interest worthy of protection. Because the personal injury action had yet to be tried, the plaintiffs had no basis to allege they would have prevailed but for the defendant's tortious conduct. However the court, likening the situation to that in *Gold*, characterized the plaintiffs' lost expectancy not as a failure to recover fully for their injuries but as a loss of the "*opportunity* to win their suit." (*Id.* at p. 503.)

The problem with this "lost opportunity" approach is that it allows recovery no matter how speculative the plaintiff's expectancy. It assumes what normally must be proved, i.e., that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference. For this reason, the continued validity of this approach has been called into question by two subsequent decisions of our Supreme Court.

The plaintiff in *Blank* v. *Kirwan, supra,* 39 Cal.3d 311, an unsuccessful applicant for a city license to operate a poker club, sued for intentional

interference with prospective economic advantage alleging the defendants had conspired to monopolize the operation of such clubs. The Supreme Court affirmed the trial court's order sustaining the defendants' demurrers and dismissing the suit. It held the plaintiff had failed to state a cause of action for interference because the first element of the tort was lacking. It reasoned the plaintiff did not have an "economic" relationship with the city, and the expectation of a license was too speculative in any event given the city's discretionary licensing powers. On this same basis, it said the plaintiff had no protectable expectancy of a relation with the class of potential poker club patrons "but at most a hope for an economic relationship and a desire for future benefit." (*Id.* at p. 331.)

The issue in *Youst* v. *Longo*, *supra*, 43 Cal.3d 64 was whether the owner of a trotter horse had a cause of action for tortious interference against a competitive driver whose actions allegedly had caused the horse to finish no better than fifth in a harness race. While implicitly critical of *Gold* and *Smith* for failing to deal completely with the speculative nature of the expectancies involved in those two cases, the Supreme Court distinguished the cases on the ground they implicated important public policies favoring fair elections and civil litigation respectively. It concluded no comparable policy considerations apply to sporting events. (*Id.* at pp. 71-74.) Moreover, it noted the tort is generally limited to prospective *business* relationships because they provide some reasonable basis for determining the fact and amount of the plaintiff's damages. It compared a horse race, on the other hand, to the licensing process involved in *Blank*. The inherent uncertainty of the process, it explained, was one of two grounds for its earlier holding; the plaintiff in *Blank* had also failed to state a cause of action for intentional interference because "the requisite relationship with third persons involved as yet unknown or nonexistent patrons . . . ." (*Id.* at p. 75.)

These two decisions, *Blank* and *Youst*, support the view that the interference tort applies to interference with *existing* noncontractual relations which hold the promise of future economic advantage. In other words, it protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise.[18] Two other decisions appear to reach the same result from a somewhat different perspective.

---

[18]In holding a tort cause of action may lie for bad faith denial of the existence of a contract, the Supreme Court in *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co., supra*, 36 Cal.3d 752, observed that the early tort of inducing a breach of contract has been expanded to permit liability for interfering with "the formation of a prospective economic relationship." (*Id.* at p. 766, italics omitted.) The court cited *Buckaloo* v. *Johnson, supra*, 14 Cal.3d 815, 827, for this proposition, a case in which a real estate broker alleged a buyer of property had

In *Asia Investment Co.* v. *Borowski* (1982) 133 Cal.App.3d 832 [184 Cal.Rptr. 317], a land developer sought to assert a claim for "interference with business opportunity" against defendants who earlier had brought an unsuccessful action to compel the city to conduct an environmental review of the developer's proposed subdivision. The developer alleged the environmental action had disrupted its economic relationship with the city. The court held, however, that the developer's only business relationship was with the class of as yet unknown purchasers of lots in the subdivision. It concluded there could not have been any actual disruption of this relationship (the fourth element of the tort) because the subdivision had not yet been approved when the environmental action was filed (and so the developer was not in a position to sell the lots). (*Id.* at pp. 840-841.) Another way to explain this result is that the developer did not have an economic relationship, either actual or potential, with any buyer when the defendants' allegedly tortious acts took place.

The plaintiffs in *Rickards* v. *Canine Eye Registration Fdtn., Inc.* (9th Cir. 1983) 704 F.2d 1449 were veterinarians who were unable to gain certification to perform eye examinations for the purpose of listing dogs in the defendant's registry of canine eye diseases. They asserted the defendant's creation of the registry violated state and federal antitrust laws and disrupted the veterinarians' economic relationship with dog owners. The court upheld a directed verdict in favor of the defendants on the ground the evidence failed to establish several elements of the interference claim including the first element which the court, relying on California law, described as "the existence of a *specific* economic relationship between [the plaintiff] and third parties . . . ." (*Id.* at p. 1456, italics added.) The court concluded the veterinarians had no specific relationship with potential registry clients, and their lack of certification did not interfere with an *"ongoing* business relationship" between the veterinarians and their regular clients, who continued to see them for other purposes. (*Ibid.*, italics in original.) Thus, in the opinion of the *Rickards* court, a defendant's tortious conduct must have interfered with a specific existing relationship, not simply with the formation of one in the future.

This view gains some additional support from the usual formulation of the elements of the tort itself requiring an economic relationship between the

---

induced the seller to withhold a commission due the broker under an implied listing agreement. Thus the question before the court in *Buckaloo* involved the performance rather than the formation of a noncontractual relationship. (*Id.* at pp. 822-827.) *Seaman's* has recently been overruled "in favor of a general rule precluding tort recovery for noninsurance contract breach, at least in the absence of violation of 'an independent duty arising from principles of tort law' [citation] other than the bad faith denial of the existence of, or liability under, the breached contract." (*Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

plaintiff and a third party, knowledge of the *existence* of the relationship on the part of the defendant and intentional acts by the defendant designed to disrupt the relationship, and actual disruption. (See, e.g., *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* 50 Cal.3d at p. 1126, fn. 2; *Youst* v. *Longo, supra,* 43 Cal.3d at p. 71, fn. 6; *Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 330; *Buckaloo* v. *Johnson, supra,* 14 Cal.3d at p. 827; *Smith* v. *Superior Court, supra,* 151 Cal.App.3d at p. 501; *Asia Investment Co.* v. *Borowski, supra,* 133 Cal.App.3d at pp. 840-841.)[19] These requirements presuppose the relationship existed at the time of the defendant's allegedly tortious acts lest liability be imposed for actually and intentionally disrupting a relationship which has yet to arise. (See Prosser & Keeton, The Law of Torts, *supra,* § 130, p. 982 ["Intentional interference of course presupposes knowledge of the plaintiff's contract or interest . . . ."].) The authors of BAJI No. 7.82 evidently understood the elements of the tort in this way; the instruction requires that "[a]n economic relationship *existed* between the plaintiff and [a third party], containing a probable future economic benefit or advantage to plaintiff," and that "[t]he defendant knew of the *existence* of the relationship." (Italics added.)

On this same subject, the court in *Ramona Manor Convalescent Hospital* v. *Care Enterprises* (1986) 177 Cal.App.3d 1120 [225 Cal.Rptr. 120] was asked to decide whether it is possible to intentionally interfere in a business relationship without knowledge of the injured party's identity. The defendant in that case operated a skilled nursing facility under a long-term lease. As the end of the lease term approached, the owner of the facility decided not to renew the defendant's lease and entered negotiations with several other parties. Informed of this fact, the defendant asserted the right to remain in possession under what it claimed was the owner's oral agreement to renew. A legal action to resolve this dispute was eventually decided in favor of the owner, whereupon the plaintiff, as the new lessee, sued the holdover tenant for intentional interference with contractual relations and prospective economic advantage. On appeal from a judgment in the plaintiff's favor, the defendant claimed among other things that it lacked the requisite intent to interfere because it had been unaware of the new lessee's identity when it asserted the right to remain. It relied on a comment in the Restatement Second of Torts providing that a defendant must have intended to affect the contract of a specific party. (Rest.2d Torts, § 766, com. p, p. 15.) Relying on

---

[19]The Restatement Second of Torts, section 766B, would impose liability for intentional interference consisting of either "(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or [¶] (b) preventing the other from acquiring or continuing the prospective relation." Comment c to this section explains this may include interference with "the opportunity of selling or buying land . . . ." (Rest.2d Torts, § 766B, com. c, p. 22.)

other language in the comment however, the court concluded this provision does not mean the party must have been identified by name; it was enough that the defendant was aware its actions would frustrate the legitimate expectations of a *specific*, albeit unnamed, new lessee. (177 Cal.App.3d at pp. 1132-1133.)

In summary, although these various authorities do not necessarily resolve the precise question before us, they suggest liability for intentional interference with prospective economic advantage does not extend as far as WCA would have it. WCA postulates an expansive view of the tort which protects WCA's economic relationship with the entire market of all possible but as yet unidentified buyers for its property. Were it not for Safeway's interference in the market, this view supposes a hypothetical buyer would have emerged at the appropriate time who was willing and able to pay the 1986 appraised (i.e., the preinterference) value of the property. Under this view, lost market value in effect becomes both the measure of injury and the injury itself.

WCA's "interference with the market" theory is but a variation of the discredited "lost opportunity" theory discussed above. It likewise fails to provide any factual basis upon which to determine whether the plaintiff was likely to have actually received the expected benefit. Without an existing relationship with an identifiable buyer, WCA's expectation of a future sale was "at most a hope for an economic relationship and a desire for future benefit." (*Blank* v. *Kirwan*, *supra*, 39 Cal.3d at p. 331.)

The situation in *Lowell* v. *Mother's Cake & Cookie Co.*, *supra*, 79 Cal.App.3d 13, another case upon which WCA relies, is very similar factually to the one presented here, with one important distinction which further points up the problem with WCA's position. The plaintiff in *Lowell* was the owner of a trucking company which derived a substantial part of its income from an oral contract to deliver the defendant's goods. He decided to sell the company and received several offers from potential buyers, including an offer for $200,000 conditioned upon the company's continued business with the defendant. The defendant, however, told prospective buyers it would terminate the delivery contract if the company were sold to a third party. Its alleged purpose was to discourage the sale and reduce the value of the company so it might eventually buy the company for less than its actual value. That is in fact what happened. The plaintiff sued for intentional interference with prospective business advantage to recover the difference between the $200,000 offer and the eventual selling price. The trial court sustained the defendant's demurrer without leave to amend and dismissed the action. The appellate court reversed.

The primary issue in *Lowell* was whether the defendant's interference was justified or privileged because its actions were otherwise lawful. The court said the question was a factual determination for the jury based upon several factors looking to the defendant's methods and motives rather than to the lawfulness of its conduct. (*Lowell* v. *Mother's Cake & Cookie Co., supra,* 79 Cal.App.3d at pp. 17-22.) WCA argues Safeway's actions were no less culpable just because they were directed at the general market rather than at particular buyers. However, the factual allegations in *Lowell*, if proven, were sufficient to show with a reasonable degree of certainty both that there were several actual buyers for the company and the amounts they were willing to pay. The same is not true in the present case.[20] (See, e.g., *Brody* v. *Montalbano* (1978) 87 Cal.App.3d 725, 738 [151 Cal.Rptr. 206] [failure to show it was reasonably probable plaintiff would have been appointed to principal's position but for defendant's critical letter to the school board]; *Wilson* v. *Loew's Inc.* (1956) 142 Cal.App.2d 183, 190-195 [298 P.2d 152] [failure to show plaintiffs had a reasonable expectation of employment in the motion picture industry but for defendants' alleged agreement to exclude suspected Communists]; *Campbell* v. *Rayburn* (1954) 129 Cal.App.2d 232, 234-235 [276 P.2d 671] [failure to show plaintiff probably would have been able to rent suitable office space but for defendant's contact with property owners].)

Thus, we conclude WCA's "interference with the market" theory of liability, by itself, is insufficient as a matter of law to show WCA had an economic relationship with a prospective buyer which was reasonably likely to produce a future beneficial sale of its property.

### (3) *WCA's Relationship With the Osugi Trust*

In light of the trial court's earlier ruling limiting the proof to Safeway's interference with a specific relationship, WCA confined its argument in

---

[20]WCA cites several cases which it contends implicitly recognize the possibility that liability may be imposed for interference with the plaintiff's prospective relationship with a class of as yet unidentified parties. All but one of these cases have been discussed above and fail to support WCA's contention for the reasons explained. (*Blank* v. *Kirwan, supra,* 39 Cal.3d 311; *Asia Investment Co.* v. *Borowski, supra,* 133 Cal.App.3d 832; *Gold* v. *Los Angeles Democratic League, supra,* 49 Cal.App.3d 365; *Smith* v. *Superior Court, supra,* 151 Cal.App.3d 491.) WCA's citation to the remaining case, *Hofmann Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390 [248 Cal.Rptr. 384], is equally unpersuasive. In *Hofmann*, a land developer brought an action for intentional interference and "intentional diminution of property value" against a chemical company whose employees made comments critical of the developer's plan to build houses near the company's plant. (*Id.* at p. 395.) The court upheld an order dismissing the action on First Amendment grounds. (*Id.* at pp. 401-408.) It did not consider much less decide whether a claim for intentional interference with prospective advantage may be based on a loss of market value.

support of its interference claim to its unsuccessful negotiations to buy the store building from the Osugi trust. Moreover, inasmuch as Safeway closed its business and removed the store fixtures before WCA entered into negotiations with the trust, WCA deemphasized the impact of those two events on the negotiations and focused instead on Safeway's exercise of its option to renew the store lease.

The trial court held there was insufficient evidence to show Safeway's acts were intended to disrupt "a known economic relationship." It also held the proof failed to show Safeway's conduct caused harm to WCA or, assuming harm, failed to establish the nature and extent of WCA's damages with reasonable certainty. WCA disputes only the latter two rulings. Its failure to address the threshold question of intent effectively concedes that issue and renders its remaining arguments moot.[21] The arguments are unpersuasive in any event.

WCA seeks to recover the difference between what it received for its portion of the shopping center and the price it claims it could have received but for Safeway's interference in its negotiations with the Osugi trust.[22] These negotiations concerned WCA's purchase of the store building, not WCA's prospective sale of the rest of the center. Thus WCA's claim still relies on the existence of a future market for the center to show the negotiations eventually would have yielded the expected benefit. The claim therefore suffers from the same inherent uncertainties discussed in the previous section in that a relationship with the general market is not

---

[21]In its reply brief, WCA attempts to recast its discussion of damages to incorporate an argument challenging the court's ruling on the element of intent. As a general rule, points raised for the first time in the appellant's reply brief will not be considered unless good reason is shown for failing to present them earlier. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 496, p. 484; *Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) None is shown here.

[22]In *Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872] the Supreme Court found the existing jury instruction on "but for" causation in negligence cases (BAJI No. 3.75) was misleading because its use of the term "proximate cause" suggested proximity in space or time. The court therefore disapproved the instruction in favor of the standard "substantial factor" instruction (BAJI No. 3.76) which it said produces the same result in "the great majority of cases." (54 Cal.3d at p. 1053.) However, the court did not rule out the possibility that a "new and proper 'but for' instruction" might be drafted for use in appropriate circumstances. (*Id.* at p. 1054, fn. 10.)

WCA contends *Mitchell* displaces the requirement for "but for" causation in intentional interference cases (*Youst* v. *Longo, supra,* 43 Cal.3d at p. 71) in favor of a lesser "substantial factor" standard. Safeway disagrees. Each side argues it has the better position regardless of which standard applies. For the reasons explained below, we should conclude WCA's proof fails under either test. Therefore we need not decide what effect, if any, *Mitchell* has in the present situation.

enough by itself to demonstrate a reasonable probability of future economic advantage.

WCA's theory of damages is unduly speculative in other respects as well. ██ WCA claims it would have purchased the store building from the Osugi trust if Safeway had not exercised its option to renew the store lease. And WCA's ownership of the entire shopping center, along with its control of the leasehold, then would have improved its prospects of attracting a new anchor tenant. We review this claim independently to determine whether there is any substantial evidence to support it. (*Hinckley* v. *La Mesa R. V. Center, Inc.* (1984) 158 Cal.App.3d 630, 636-637 [205 Cal.Rptr. 22].)

WCA's offer of proof in this regard was limited to the opinions of its two expert witnesses who were prepared to testify that there was a "reasonable probability" an anchor tenant could have been found to occupy the store building if Safeway had allowed its lease to expire. Their opinions, in turn, were based in part on an inference that Bryne and Hoffman would not have pursued their alleged scheme if they had not also believed this to be true. In addition, WCA asserted without further explanation that it could have survived financially during the time it would have taken to install a new tenant and restore the shopping center to financial health.

These conclusory assertions lack any factual basis in the record. Rather, the proffered facts point to the opposite conclusion. They show, for instance, that the opening of a nearby Lucky's store and a decline in the local economy made operation of a supermarket in the Safeway location at best a marginal business proposition; that the shopping center's decline was attributable in large part to events which preceded Safeway's exercise of its option; that no potential tenant other than Save Mart expressed what could be considered a serious interest in the vacant building; that removal of the store fixtures caused Save Mart to lose whatever interest it had in the building and led Hoffman to abandon his efforts to put together a deal for the center; that WCA was already behind in its loan payments and faced with foreclosure when it attempted to buy the store building; and, if its negotiations had been successful, that WCA would have assumed an additional $750,000 debt while losing the base rent paid by Safeway.

A plaintiff seeking to recover for a future loss must show with reasonable certainty that the loss actually would have accrued. (*S. C. Anderson, Inc.* v. *Bank of America* (1994) 24 Cal.App.4th 529, 536 [30 Cal.Rptr.2d 286]; *California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1,

62 [221 Cal.Rptr. 171].) "Damages which are remote, contingent, or merely possible cannot serve as a legal basis for recovery." (*Ibid.*)

■ "In determining whether a nonsuit was properly granted the reviewing court must resolve every conflict in testimony in favor of the plaintiff and at the same time indulge in every presumption and inference which could reasonably support the plaintiff's case. [Citation.] The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper. [Citation.]" (*Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456].)

■ WCA theorizes, in essence, that its unified ownership of the shopping center would have improved the chances that a new anchor tenant could be found in time to restore the value of the center before WCA was forced to sell its interest. Simply to state the theory is to expose its inherent uncertainty. In any event, the proffered testimony of WCA's experts, even if accepted at face value, fails to support the theory. We conclude, as did the trial court, there is no evidence sufficient to establish with reasonable certainty either the fact or the amount of WCA's damages stemming from Safeway's alleged interference in WCA's negotiations with the Osugi trust.[23] (See *S. C. Anderson, Inc.* v. *Bank of America*, *supra*, 24 Cal.App.4th at pp. 536-538; *California Shoppers, Inc.* v. *Royal Globe Ins. Co.*, *supra*, 175 Cal.App.3d at pp. 61-63.)

### B. *Breach of an Implied Covenant**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[23]In view of this conclusion, we need not discuss Safeway's other arguments in support of the court's rulings. Safeway also contends (1) WCA, as a successor to Westside Center's interest in the original Safeway lease, effectively consented to the acts it now claims were tortious (closure of the store, removal of the fixtures, and renewal of the lease) because all the acts were expressly authorized by the lease; (2) all Safeway's acts were justified for various business reasons; and (3) WCA suffered no damages because Ralph Wegis, one of the partners in WCA, also had an interest in the partnership which eventually bought the center from WCA.

*See footnote, *ante*, page 507.

## IV. Disposition

The judgment is affirmed and defendants are awarded costs on appeal. Safeway's cross-appeal is dismissed

Vartabedian, J., and Harris, J., concurred.